**UNITED STATES of America,**
**Plaintiff,**

v.

**CHAS. PFIZER & CO., Inc., Defendant.**
**Civ. A. No. 18740.**

United States District Court
E. D. New York.
May 5, 1965.

------

John J. Galgay, John D. Swartz, U. S. Dept. of Justice, Anti-Trust Div., for plaintiff; Herman Gelfand, Stanley W. Nathanson, New York City, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant; John E. F. Wood, Charles E. Stewart, Jr., Judson A. Parsons, Jr., Richard F. Coyne, Robert A. Meister, Lynn J. Ellins, New York City, of counsel.

MISHLER, District Judge.

The Government instituted this proceeding on May 28, 1958, pursuant to Section 4 of the Sherman Act (15 U.S.C. § 4), to prevent and restrain violations of Section 2 of the Sherman Act (15 U.S.C. § 2) [1] and Section 3 of the Clayton Act (15 U.S.C. § 14). [2]

The Section 2 violation charges defendant with the monopolization and attempted monopolization of citric acid, in its use as an acidulant in foods and beverages and in effervescent alkalizing powders and tablets. The Section 3 violation charges that defendant engaged in specific business practices, i. e., the making of certain contracts, which had the effect of substantially lessening competition.

### Citric Acid—Defendant's Production, Supply and Distribution

Defendant commenced production of citric acid in or about 1880 from citrate of lime or concentrated lemon or lime juice. By 1923, defendant devised a process of producing citric acid through surface fermentation of molasses. Further development of that process made it commercially useful in or about 1935. Defendant's process is a trade secret.

During the complaint period (from 1946 to May 28, 1958—the date of filing the complaint), defendant completely dominated the production, sale and distribution of citric acid in the United States. Defendant's position is dramatically expressed in the Government's analysis of the facts stipulated between the parties, which is appended to this opinion. During the period 1950 to 1958, defendant produced no less than 88% of all the domestic citric acid (1956); during 1950, the high, it produced 96.8%. During the same period, it accounted for 92.3% of the total domestic sales in 1951; and sales reached 97.2% in 1957. The rest of production and sales was divided among four competitors—Hawaiian Pineapple Company, Exchange Lemon Products Company, Stauffer Chemical Company and Miles Chemical Company, a division of Miles Laboratories, Inc.

1. § 2. Monopolizing trade a misdemeanor
    Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

2. § 14. Sale, etc. on agreement not to use goods of competitor
    It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

*Control of Production, Sale and Distribution of Citric Acid*

The Government's theory of statutory liability is that such dominance of production, sale and distribution of citric acid is a monopolization or attempted monopolization of a "part of the trade or commerce among the several States." Alternatively, the Government argues that citric acid constituted the largest share of the acidulant market and monopolization of citric acid "must constitute monopolization or an attempt to monopolize the food, beverage and pharmaceutical acidulant market." (Post-trial brief p. 15).

*Dominance over Production, Sale and Distribution of Citric Acid*

The Government cites United States v. Aluminum Co., 1945, 2d Cir., 148 F.2d 416 as authority for its charge of monopolization of the citric acid market. There, the Court sustained a charge of a Section 2 violation upon finding that the relevant market was virgin aluminum, and the further finding that Alcoa occupied 90% of that market. The Court said: "[t]hat percentage is enough to constitute monopoly * * *." (Id. at 424).

■ Alcoa did not define the control of production, sales and distribution of a product, ipso facto, as a Section 2 violation. Rather, the Court found no available substitute. In the absence of competitive products, the use of virgin aluminum was, for the purposes of that case, the relevant market. The statute does not proscribe control of a product, but rather the monopolization or attempted monopolization of a part of trade or commerce. In United States v. E. I. du Pont De Nemours & Co., 1956, 351 U.S. 377, 394, 76 S.Ct. 994, 1006, 100 L.Ed. 1264, the Court said:

"When a product is controlled by one interest, *without substitutes available in the market*, there is monopoly power." [Italics supplied].

■ The Court pointed to the use, rather than the product, in determining the relevant market. du Pont p. 396 (S.Ct. at p. 1008).

The Government charges monopolistic power over citric acid in its use "as an acidulant in foods and beverages and in effervescent alkalizing preparations." (Gov't's post-trial brief, p. 5).

Monopoly power over a part of "trade or commerce is the power to control prices and exclude competition." Standard Oil Co. v. United States, 1911, 221 U.S. 1, 51, 31 S.Ct. 502, 512, 55 L.Ed. 619. Delineation of the market for antitrust purposes is vital to the Government's case. The statutory proscription is directed against:

(1) The power to fix the price of acidulants and to exclude others from entry into the acidulant market in foods, beverages and effervescent alkalizing powders (Section 2); and

(2) The practice charged of entering into all-requirements contracts which have the effect of substantially lessening competition in such market (Section 3). It is apparent, to prevail, the Government must prove the relevant market. To sustain the Section 2 charge, it must show defendant occupied such portion of that market to give it the power to fix prices and exclude competition. To sustain a Section 3 violation, it must show that the all-requirements contracts had the effect of substantially lessening competition in that market.

The Court notes the market chosen by the Government consists of at least two separate markets, i. e., food and beverages as one, and effervescent alkalizing preparations as another. The line between food and beverages on the one hand, and effervescent alkalizing preparations on the other, is marked by the distinctive use of the acid made by each, and the difference in classification by type of industry. The general classification of foods and beverages might be further classified, and sub-markets delineated in each market. Brown Shoe Co. v. United States, 1962, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510. Under the facts here found, such analysis is of no significance.

Consumers of citric acid are manufacturers of various end products. Citric acid and its substitutes are ingredients of products offered by the manufacturers to the ultimate consumer.

■ To determine whether acids are in competition in a particular industry it is first necessary to decide whether they can be used for the same purpose—whether they are functionally interchangeable, Note, The Market: A Concept in Anti-Trust, 54 Colum.L.Rev. 580 (1954); and functional interchangeability does not require complete identity of use. Having found one or more products functionally interchangeable with citric acid in a particular use, the next question to be resolved is one of purchaser reaction—the willingness or readiness to substitute one for the other.[3]

■ In determining reasonable (reactive) interchangeability of acids for the use referred to, the factors that normally determine the choice or preference of the user must be considered. The difficulty and cost of adapting a method or process of manufacture to the varying physical characteristics of a substitute, as well as transportation and storage, must be examined in determining reasonable interchangeability. Solubility, melting point, significant taste or odor, and physical state of the substitute, also bear on the issue. The significance of each factor varies with the user and the requirements of the product. If price changes of one product affect the sales of another, such responsiveness is indicative of the competition of the products. This business reaction is described in du Pont, supra, 351 U.S. at 400 (76 S.Ct.

at 1010) as "cross-elasticity of demand between products."

The Government's argument that citric acid is superior to competing products and therefore alone in the market, was made by the Government in du Pont and answered at p. 399 (76 S.Ct. at 1009), as follows:

"But, despite cellophane's advantages it has to meet competition from other materials in everyone of its uses."

The dissent held "cellophane is the relevant market" (p. 425, S.Ct. at p. 1022).

Despite advantages of citric acid, other acids were available and functionally interchangeable with it.[4] An examination of the use of acidulants in specific foods and beverages and effervescent alkalizing preparations, will determine whether such acids were in effective competition with citric acid in those markets during the complaint period.

One of the major uses of acidulants in foods is in gelatin desserts. More than half of the gelatin dessert market is held by General Foods Corporation in its preparation of Jell-O and D-Zerta (a low-caloried gelatin) and Standard Brands, Inc. in its preparation of Royal Gelatin. General Foods used citric acid in Jell-O during the complaint period; it used citric acid in D-Zerta until 1958 when it substituted fumaric acid. During the entire complaint period, Standard Brands used fumaric acid in Royal Gelatin.

■ As of 1958, the price of fumaric acid was comparable with that of citric. Less fumaric acid is required than citric acid—about 20%—to produce the same

---

3. While a finding of functional interchangeability must precede that of reasonable (reactive) interchangeability, it is not determinative. For products to be classified in the same market they must be both functionally and reasonably interchangeable. See Note, 54 Colum.L.Rev. 580, 592 (1954). For example: Hydrochloric acid is a corrosive acid and cannot be used as an acidulant in food or beverages or in effervescent alkalizing powders. It is, therefore, functionally non-interchangeable with citric acid. On the

other hand, malic acid is functionally interchangeable with citric acid in many of its uses as an acidulant. During the complaint period it was priced substantially higher and was found to lend an apple flavor and taste to a product. It was not readily substituted for citric acid in most products and, therefore, reactively non-interchangeable in those products.

4. Discussion of the uses of acids and their reasonable (reactive) interchangeability is based on a prior determination of their functional interchangeability.

result in gelatin dessert. Both acids are solids. The melting point of fumaric acid is appreciably higher than that of citric (287° cent. vs. 153° cent.); the Government failed to show the significance of this difference in the use of fumaric acid as an acidulant in gelatin desserts. It is not necessary in establishing reasonable interchangeability to show the same or similar physical characteristics and chemical composition or reaction. The substitution of one acid for another as an acidulant demonstrates their reasonable (reactive) interchangeability.

Fumaric and citric acid are engaged in competition for powdered dessert preparations used for lemon puddings and lemon pie fillings. General Foods used citric acid in this preparation until 1951. In that year, one of four plants substituted fumaric acid; in 1953, the other three plants switched to fumaric acid. Another widely used lemon powder preparation— My-T-Fine—used citric acid except for part of the World War II years; when citric acid was not available, it used tartaric and malic acid as substitutes. Standard Brands used fumaric acid in such lemon powdered preparations "for many years." (Ex. 118, par. 6(n)).

Fumaric and citric acids were in competition for pectin-type products. General Foods used citric acid as an acidulant in Sure-Jell until March 1958. At that time, it substituted fumaric acid. The reactive interchangeability of these products is demonstrated by their substitution in the succeeding years. Citric acid was substituted for fumaric in 1959 or 1960; it was replaced by fumaric acid in 1963.

Acidulants are used in pectin-type foods (as limited by the rules of the Food and Drug Administration) to compensate for any deficiency in the natural acidity of fruit. The industry has substituted lemon juice, lime juice, lactic acid, tartaric acid and vinegar for citric acid. Lactic acid and tartaric acid were competitively priced with citric acid during the complaint period.

In the manufacture of sherberts and ices, citric acid was reasonably interchangeable with lactic acid during the complaint period, and their use was part of the relevant market.

■ Defendant argues for inclusion of the use of acids in baking powders, baking products and rye sours (used as a leavening agent in baking) as part of the relevant market. Acids are used in baking powders and baking products to release carbon dioxide. They produce a chemical reaction similar to that in effervescent alkalizing powders. It is not used, as in foods and beverages, to add an acid tang and thus to enhance the flavor of the products; and its release of carbon dioxide is not as an alkalizer. On the other hand, in rye sours flavor is added by the use of acidulants, but there is no showing that such use is similar to that of acidulants in other foods. I have, therefore, declined to consider baking powders, baking products or rye sours as part of the relevant market.

Citric acid competes with lactic, tartaric and phosphoric acid in the carbonated beverage industry. During the complaint period, tartaric acid competed with citric in grape-flavored carbonated beverages. In all other fruit flavors tartaric, phosphoric and lactic acid competed with citric acid. In cola-flavored drinks, though phosphoric acid was the acidulant traditionally used, citric acid has been substituted, and used in combination with phosphoric acid; citric acid also competed with tartaric acid in cola-flavored carbonated beverages.

■ Defendant would include the wine-producing industry as part of the relevant market. The wine industry is not of the same class as the soft-drink industry. International Boxing Club v. United States, 1959, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270; United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. The use of acids in wine is, therefore, not under consideration as part of the relevant market.

The use of acidulants in effervescent alkalizing preparations is a market separate and apart from the use of acidulants in foods and/or beverages. In effer-

vescent alkalizing powders, the acidulant is used to release carbon dioxide, while in foods and beverages, it imparts an acid tang to the product and enhances its flavor.

■ The two leading effervescent alkalizing powders—Alka-Seltzer and Bromo Seltzer—used critic acid to trigger the effervescent action. Brioshi and Eno Salts, two well-advertised brands, used tartaric acid. It is clear that in this market tartaric acid competes effectively with citric acid; the acids are reasonably interchangeable. The Government bears the burden of proving the relevant market. Defendant's control cannot be measured without a showing of the proportionate amount of the relevant market that used citric acid during the complaint period. "[T]here must be a definite factual showing of illegality." Standard Oil Co. (Indiana) v. United States, 1931, 283 U.S. 163, 179, 51 S.Ct. 421, 427, 75 L.Ed. 926. In du Pont, the Court said 351 U.S. at p. 393 (S.Ct. at p. 1006): "Illegal power must be appraised in terms of the competitive market for the product." The absence of proof left the bounds of relevant market without definition on all the alternative theories of relevant market, i. e., food, beverage, effervescent alkalizing preparations or any combination of these industries. The Government failed in sustaining its burden of proving the relevant market. United States v. Grinnell Corp., 1964, D.R.I., 236 F.Supp. 244.

The Government's charge of a Section 2 violation must fail for the reason stated by Justice Frankfurter in his concurring opinion in du Pont, 351 U.S. at p. 413 (S.Ct. at p. 1016), as follows:

"Mr. Justice REED has pithily defined the conflicting claims in this case. 'The charge was monopolization of cellophane. The defense, that cellophane was merely a part of the relevant market for flexible packaging materials.' Since this defense is sustained, the judgment below must be affirmed and it becomes unnecessary to consider whether du Pont's power over trade in cellophane would, had the defense failed, come within the prohibition of 'monopolizing' under § 2 of the Sherman Act."

### Post-Complaint Evidence

■ The parties were in disagreement as to the admissibility and pertinence of post-complaint evidence. See F. T. C. v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965). Defendant asked the Court to consider potential competition as proof of lack of dominance during the complaint period. The Court refused to consider such evidence as proof of potential competition at the time of filing of the complaint. Similarly, the Court did not consider post-complaint competition from acids which were unavailable during the complaint period. Such evidence was considered in determining the functional interchangeability of acids which were available during the complaint period and to prove conditions or facts during the complaint period which were necessary to a determination of the issues. 2 Wigmore, Evidence § 437 (2d Ed. 1940); du Pont, 1936, 118 F. Supp. 41. The defendant conceded that post-complaint facts will not serve to "exonerate the defendant nunc pro tunc." (Def's post-trial brief, p. 2).

### Section 3 Violation

The Government charges the defendant with a Section 3 violation (15 U.S.C. § 14) in that "the defendant has been making sales or contracts for the sale of citric acid manufactured by it on the condition, agreement or understanding that the buyers shall not purchase or deal in citric acid of a competitor. * * *" Defendant entered into twelve (12) month all-requirements contracts with manufacturers (General Foods Corporation and Perkins Products Company—a division of General Foods Corporation) and distributors (New York Quinine and Chemical Works, Inc. and Mallinckrodt Chemical Works). The contracts were made at the request of the purchasers. Having experienced a shortage in the supply of citric acid, they sought assurance of continued supply. In Tampa

Elec. Co. v. Nashville Coal Co., 1961, 365 U.S. 320, 334, 81 S.Ct. 623, 631, 5 L.Ed. 2d 580, the Court said:

"* * * There is here neither a seller with a dominant position in the market as in Standard Fashions [Fashions Standard Co. v. Magrane Houston Co., 1922, 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653], supra; nor myriad outlets with substantial sales volume, coupled with an industry-wide practice of relying upon exclusive contracts, as in Standard Oil [Oil Standard Co. v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371], supra; nor a plainly restrictive tying arrangement as in International Salt [International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20], supra. On the contrary, we seem to have only that type of contract which 'may well be of economic advantage to buyers as well as to sellers.' Standard Oil Co. v. United States, supra * * *."

The Government's argument points to the percentage of the citric acid market controlled by the defendant through these all-requirements contracts. It argues that the all-requirements contracts encompass 27% of the citric acid market and that this percentage constitutes such a significant portion of the citric acid market, that it, per se, has the effect of tending to lessen competition. Government's post-trial brief p. 66. Thus, the Government again bases its calculations and proof upon sales in the citric acid market, rather than in the food and beverage and/or effervescent alkalizers market. This argument is based upon the rule of quantitative substantiality set forth in Standard Oil. See Kessler & Sharp, Competition, Contract, and Vertical Integration, 69 Yale L.J. 1, 36 (1959). The Court, in Tampa, however, discredited in part and departed from that test. It stated: (365 U.S. at 329, 81 S.Ct. 629)

"* * * To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence."

See Susser v. Carvel Corp., 1964, 2d Cir., 332 F.2d 505, cert. granted, 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964); Curly's Dairy, Inc. v. Dairy Cooperative Ass'n, 1962, D.Ore., 202 F.Supp. 481.

■■■ Though the proof requisite to a finding of a violation of § 3 of the Clayton Act is less than that required for a finding of a violation of § 2 of the Sherman Act, see Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277; Curly's Dairy, Inc. v. Dairy Cooperative Ass'n, supra, a demarcation of the relevant market is as essential to one as to the other; and the standard used in determining the proper relevant market is the same. See Brown Shoe Co. v. United States, 1962, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510; Tampa Elec. Co. v. Nashville Coal Co., supra.

■■■ It is evident that some of the aforementioned 27% of the citric acid market is in effective competition in the food and beverage and/or effervescent alkalizers market, but a showing of some competition is far from the requisite proof of "substantiality" required under Tampa. Absent proof of the relationship between the volume of citric acid sold under the all-requirements contracts and the relevant market, the claim of a § 3 violation must fail.

The Court has this day signed and filed Findings of Fact and Conclusions of Law, dismissing the complaint.

## TABLE I

### U. S. PRODUCTION OF CITRIC ACID
(In Thousands of Pounds)

| Year | Pfizer | | Hawaiian | | Exchange | | Stauffer | | Miles | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lbs. | % | Lbs. | % | Lbs. | % | Lbs. | % | Lbs. | % | Lbs. |
| 1950 | 42,220 | 96.8 | 477 | 1.1 | 889 | 2.0 | 0 | 0 | 0 | 0 | 43,586 |
| 1951 | 50,841 | 92.8 | 463 | 0.8 | 3,505 | 6.4 | 0 | 0 | 0 | 0 | 54,809 |
| 1952 | 35,545 | 91.9 | 531 | 1.4 | 1,728 | 4.5 | 0 | 0 | 860 | 2.2 | 38,664 |
| 1953 | 46,021 | 93.8 | 511 | 1.0 | 1,036 | 2.1 | * | * | 1,473 | 3.0 | 49,041 |
| 1954 | 49,548 | 90.9 | 479 | 0.9 | 1,485 | 2.7 | * | * | 2,976 | 5.5 | 54,488 |
| 1955 | 56,764 | 90.7 | 464 | 0.7 | 2,048 | 3.3 | 0 | 0 | 3,278 | 5.2 | 62,555 |
| 1956 | 53,717 | 88.0 | 583 | 1.0 | 1,704 | 2.8 | 0 | 0 | 5,029 | 8.2 | 61,033 |
| 1957 | 58,262 | 89.9 | 462 | 0.7 | 352 | 0.5 | 0 | 0 | 5,762 | 8.9 | 64,837 |
| 1958 | 61,973 | 90.8 | 562 | 0.8 | 108 | 0.1 | 0 | 0 | 5,647 | 8.3 | 68,290 |
| | 454,891 | 91.5 | 4,532 | 0.9 | 12,855 | 2.6 | 0 | 0 | 25,025 | 5.0 | 497,303 |

SOURCE: Stipulation of Facts, Paragraph 13(a)–13(e)

*Included in Figures for Exchange

TABLE II

U. S. SALES OF CITRIC ACID

(In Thousands of Pounds)

| Year | Pfizer | | Hawaiian | | Exchange | | Stauffer | | Miles | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lbs. | % | Lbs. | % | Lbs. | % | Lbs. | % | Lbs. | % | Lbs. |
| 1950 | 39,463 | 95.8 | 716 | 1.7 | 996 | 2.4 | 0 | 0 | 0 | 0 | 41,175 |
| 1951 | 37,979 | 92.3 | 503 | 1.2 | 2,678 | 6.5 | 0 | 0 | 0 | 0 | 41,160 |
| 1952 | 32,242 | 93.7 | 404 | 1.2 | 1,780 | 5.2 | 0 | 0 | 0 | 0 | 34,426 |
| 1953 | 40,676 | 96.0 | 593 | 1.4 | 966 | 2.3 | 155 | 0.4 | 0 | 0 | 42,390 |
| 1954 | 38,266 | 95.8 | 500 | 1.3 | 923 | 2.3 | 244 | 0.6 | 0 | 0 | 39,933 |
| 1955 | 47,437 | 95.4 | 384 | 0.8 | 1,523 | 3.1 | 370 | 0.7 | 0 | 0 | 49,714 |
| 1956 | 43,645 | 94.9 | 568 | 1.2 | 1,778 | 3.9 | 0 | 0 | 0 | 0 | 45,991 |
| 1957 | 49,500 | 97.2 | 459 | 0.9 | 623 | 1.2 | 0 | 0 | 369 | 0.7 | 50,951 |
| 1958 | 51,279 | 97.0 | 497 | 0.9 | 63 | 0.1 | 0 | 0 | 1,020 | 1.9 | 52,859 |
| | 380,487 | 95.5 | 4,624 | 1.2 | 11,330 | 2.8 | 769 | 0.2 | 1,389 | 0.3 | 398,599 |

SOURCE: Stipulation of Facts, Paragraph 13(a)–13(e)