Charles W. BOWEN, Jr. d/b/a Suburbia
News Delivery Service, et al.,
Plaintiffs,

v.

NEW YORK NEWS, INC., et al.,
Defendants.

No. 67 Civ. 1030.

United States District Court,
S. D. New York.

June 29, 1973.

Judgment Aug. 23, 1973.

654

Herbert Monte Levy, New York City, for plaintiffs.

Nicholas L. Coch, New York City, for defendants Michael Lepore and Victore Lepore.

Townley, Updike, Carter & Rodgers, New York City, for other defendants (Andrew L. Hughes, Ronald S. Daniels, John M. Callagy, New York City, of counsel).

BAUMAN, District Judge.

This is an action by thirty independent home delivery dealers [1] of The Daily News and the Sunday News against New York News, Inc. ("The News"), the publisher of those newspapers, and various of its employees and franchise dealers for treble damages and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. The request for relief is based upon alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; and Sections 2(a), 2(c), 2(d), 2(e) and 2(f) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (c), (d), (e) and (f). At issue is the effort of The News to change its home delivery system from one employing independent route dealers to one utilizing carrier boys operating in conjunction with "franchised dealers". [2]

## I.

In order to understand the exact nature of the alleged antitrust violations set forth in the complaint, it is necessary to describe in some detail the parties to this action and their relationships with each other.

The News is a New York corporation engaged in the business of publishing and distributing the "Daily News" and "Sunday News", newspapers published in New York City and generally distributed in the New York metropolitan area and, to a lesser extent, in the United States and foreign countries. At the time of this lawsuit, its circulation was approximately 2,000,000 papers daily and 3,000,000 on Sunday, the largest of any newspaper in the United States.

The News concedes, as well it might, that it is engaged in interstate commerce within the meaning of the Sherman and Clayton Acts. It is undisputed that it carries local, state, national and international news, including sports, nationally known columnists, comics and other syndicated features. Its enormous advertising content includes the messages of industrial giants from every corner of the United States.

The remaining defendants are either present or former News employees or present or former franchise dealers. [3]

---

1. Plaintiff Robert C. Harding withdrew from this action on May 22, 1972.

2. The changeover was part of an effort by The News to obtain greater control over the resale price and method of distribution of its paper.

The route dealers purchased newspapers from The News (at wholesale prices) and delivered them to their customers by use of automobile. However, since the route dealers also distributed competing newspapers, The News was not in a position to dictate the home delivered price of its newspaper.

For reasons which will appear later in the opinion, The News felt that this limitation seriously impaired its ability to compete in the home delivery market. It decided therefore to institute its own home delivery system and structured it around independent contractors which it designated "franchise dealers". These franchise dealers agreed to deal only in The News and to purchase quantities of The

News in bulk for resale to carrier boys at prices fixed by The News. The carrier boys, in turn, resold to the public "at no more than the regularly assigned home delivered price."

3. Aside from The News itself, the first eight named individual defendants are present or former News employees.

Jack Underwood was Circulation Manager of The News from October, 1964 to June, 1970, and is presently Director of Circulation.

Robert O'Sullivan was Home Delivery Area Supervisor for The News from March, 1968 to July, 1969, and is presently the Manager of The News' Brooklyn plant.

Anthony Catanzaro was Assistant Suburban Area Sales Manager from February, 1966 to November, 1966, and is presently Assistant Circulation Sales Manager for Home Delivery.

David Auerbach has been a Circulation Sales Representative since October, 1962.

The plaintiffs are, or were, independent route dealers dealing in a number of newspapers, periodicals and special interest publications. In general, they purchase these items from wholesalers and resell them to home delivery subscribers in defined territories.[4] Because each confines his activities to his own territory, the routes have become more or less valuable and salable.

Prior to 1965, The News was home delivered exclusively by such route dealers. However, owing to circumstances to be related, The News became dissatisfied with its growth of home delivery circulation and decided to test a new distribution system in certain areas of the suburban metropolitan area, principally in Nassau and Suffolk Counties, using carrier boys who would buy their papers from franchised dealers. At the same time, it continued to deal with many of the route dealers in the time honored way. For this reason, the plaintiffs in this action fall into four separate categories.

(1) Route dealers to whom The News terminated sales on or after January 10, 1966;[5]

(2) Route dealers who continue to receive copies of The News and who operate in areas in which the franchise system has not been instituted;[6]

(3) Route dealers who continue to receive copies of The News and who operate in areas in which the franchise system has been instituted;[7]

(4) One route dealer who acquired his route from a terminated route dealer and who never sought to purchase from The News.[8]

The application of the legal theories advanced by the plaintiffs vary with respect to each of these categories and this difference will be noted as each of the theories is discussed.

## II.

In the early 1960's, The News' circulation in New York City began to decline largely because of the fall off in sales of its evening edition which eventuated from the increasing popularity of television and the decreasing number of retail outlets remaining open in the evening. At the same time, the suburban explosion was creating a burgeoning market for newspaper sales which coincided with a similar shift of commercial enterprises from the city to the suburbs and their evolution as prime advertising markets. Since the bulk of The News' revenues comes from advertising, its appetite for its share was, quite naturally, whetted.

Donald A. Nizen was Suburban Area Sales Manager from May, 1964 to May, 1967, and is no longer employed by The News.

Gabriel Lewander was Circulation Sales Manager from January, 1970 to December, 1970, and is no longer employed by The News.

F. M. Flynn was President of The News from May, 1947 to May, 1970, and is currently Chairman of the Board of the Corporation and Publisher of The News.

W. H. James was Executive Vice President of The News from April, 1965 to May, 1970, and is currently its President.

The remaining defendants are or have been franchise dealers.

4. This exclusivity had its genesis in horizontal arrangements of doubtful legality prepared in the "Danby office." This office, which represented all the major newspapers published in New York City, was authorized to award exclusive territories for the home delivery of all member newspapers; and

most of the plaintiffs purchased their routes with its written approval. Since the demise of the "Danby office", the route dealers have continued to respect these boundaries.

5. Plaintiffs *Bowen, Cartabuke, Ditta & Failla, Davis, Goldberg, Gullo, Markowitz, Mirro, Poserow, Rosenblum, Schulz, Sweeney, Kahrs, Floral Park News Delivery Inc. (Gold), Amato,* and *Perrot.*

6. Plaintiffs *Freilich, Marston, Rosenblatt, Theall, Salant, Silverstein, Cestaro,* and *Ellis.* Plaintiffs Ellis, Marston, and Silverstein have sold their routes, but received copies of The News during the entire time they operated them.

7. Plaintiffs *Huntington News Delivery, Inc. (Hand), Shank, Fox, Greenberg,* and *Holman.* Plaintiff Fox has sold his route, but received copies of The News during the entire time he operated it.

8. Plaintiff *Rathsam.*

To this end, it attempted to compete with regional and local newspapers for circulation and advertising by publishing a number of suburban or zone sections, each of which was and is distributed as part of The News in a specific geographic area. These suburban sections, which carry area news, also carry local advertising at lower rates than are charged for the full run of the paper.

However, under the route dealer system, The News' campaign was something less than successful. While the population of Nassau and Suffolk Counties rose by approximately 350,000 between 1960 and 1966, The News' home delivered circulation in that area increased by only 2,383 copies. At the same time, Newsday's home delivered circulation increased dramatically as did that of the Long Island Press.

The News decided that its failure resulted from the disinterest of route dealers and hired Jack Underwood to develop a new distribution system.

In 1965 he instituted a pilot franchise dealer program in an area of Nassau County not then being serviced by a route dealer. This was so successful that it became the model for The News' new distribution system which was then expanded into certain parts of New York City and almost throughout Long Island. The franchise dealers who participated in the program were signed to contracts, the relevant provisions of which are:

(1) that The News agrees to assign an exclusive territory to the dealer;

(2) that the dealer agrees to purchase all newspapers required by home delivery customers at prices fixed by the The News and supervise the delivery of them "at no more than the regularly assigned home delivery price";

(3) that the dealer agrees not to sell or distribute copies of any other newspaper, or any advertising material not authorized by The News;

(4) that the dealer agrees not to charge any carrier boy engaged in making deliveries and collections more than the price established therefor by The News;

(5) that the dealer does not have the right to return unsold copies of The News;

(6) that The News may terminate the agreement without advance notice if the dealer breaches any of its provisions, but that the dealer must give sixty days' notice in writing; and

(7) that the dealer "is and shall remain an independent contractor and not an employee or agent of The News."

In late 1965 and early 1966, a number of the plaintiffs were contacted by letter or telephone and offered the opportunity to become franchise dealers.[9] Those who responded were told that if they did not agree to adhere to all of the provisions of the franchise agreement their supplies of The News would be cut off. None of them was willing to bow to its restrictive terms and, within time, each was notified by letter or otherwise that The News would no longer deal with

---

9. E. g. Bowen, Jaycox, Ditta & Failla, Gold, Fox, Goldberg, Gullo, Kahrs, Markowitz, Perrot, Rosenblum, Sweeney, Poserow, Schulz.
 The letter read:
 "The News plans to expand its Franchise Home Delivery operation in certain areas of New York City and Long Island. It has been proven that this type of Home Delivery is productive and beneficial to the publisher and that it insures a steady, healthy growth in circulation.
 In order to accomplish this task, The News is seeking the services of qualified men to supervise the boy delivered franchise districts. If you are interested in joining the team as a full time exclusive News Franchise Manager, please telephone Mr. D. A. Nizen MU 2–1234 ex. 8046 of the News Suburban Circulation Sales Department.
 An appointment for an interview will be arranged at the earliest possible convenience. Please respond promptly since our selections of Franchise Managers will be made within the next few weeks.

 Sincerely,
 Gabriel Lewander"

him.[10] In all, sixteen plaintiffs were cut off.[11]

In the meantime, The News continued to recruit franchise dealers who were subsidized to help them through the early organizational phase of their operation and were charged less for The News than the route dealers who had not been terminated.

The eliminated route dealers attempted to buy copies of the paper from local newsdealers, but, with rare exception, found no one in Nassau or Suffolk willing to cooperate with them. As a result, they were forced to travel great distances and pay close to cover price to obtain its early editions. However, when franchise dealers complained that they were still facing competition from the "cut off" route dealers, defendants O'Sullivan and Cantanzaro directed them to ascertain the sources of the route dealers' supplies and promised that they would be eliminated. This precipitated a relentless campaign by the franchise dealers to learn the route dealers' sources of supply in which News employees enlisted and, as a result of which, the route dealers were under constant surveillance by franchise dealers, employees of The News and off-duty policemen recruited for this purpose. In some instances, the policing activities of the defendants turned into sheer harrassment. For example, when plaintiff Markowitz was observed removing papers from a drug store, The News had him arrested despite the fact that he claimed he had a written contract with the owner, one Max Seltzer, which authorized him to do so. When Seltzer was asked by defendant Auerbach to prosecute Markowitz, he confirmed Markowitz' story. He was told that if he did not agree to press charges The News would no longer supply him with papers. Seltzer refused and was cut off the next day.

### III.

Plaintiffs contend that (1) The News' franchise agreement is an illegal price fixing agreement and that sales to them were discontinued in furtherance thereof; (2) the defendants have combined, in violation of Section 1 of the Sherman Act, to exclude them from access to copies of The News; (3) the franchise agreement contains illegal territorial and customer restrictions; (4) The News has attempted to monopolize the newspaper home delivery market; (5) the defendants have conspired to monopolize a part of the newspaper home delivery market; (6) the exclusive dealing provision of the franchise agreement violates Section 3 of the Clayton Act; and (7) The News violated the Robinson-Patman Act by discriminating in prices between different purchasers of The News.

### IV

The News relies heavily in its defense on ¶ 2 of the McGuire Act, 15 U.S.C. § 45(a)(2) [12] and the New York Feld-Crawford Act, N.Y. General Business Law, McKinney's Consol.Laws, c. 20, § 369–a et seq.[13] It contends that these

---

10. The letters read:
"The News has decided to institute an independent franchise home delivery system in the area in which you now serve. The franchised home delivery carrier will handle the Daily and Sunday News on an exclusive basis.
Therefore, we must advise you that effective on ————, sales to you of the Daily and Sunday News will be discontinued.
Very truly yours,
NEWS SYNDICATE CO., INC.
By
Gabriel Lewander"

11. The following plaintiffs were cut off on the dates set forth below:

| Plaintiff | Date of Termination | Date of Notice |
|---|---|---|
| Ditta & Failla | January 10, 1966 | December 25, 1965 |
| Markowitz | January 10, 1966 | December 27, 1965 |
| Perrot | January 10, 1966 | December 25, 1965 |
| Sweeney | January 10, 1966 | None |
| Schulz | February 14, 1966 | January 31, 1966 |
| Bowen | February 28, 1966 | February 16, 1966 |
| Kahrs | May 9, 1966 | April 22, 1966 |
| Mirro | May 9, 1966 | April 22, 1966 |
| Goldberg | June 13, 1966 | June 1, 1966 |
| Poserow | July 4, 1966 | June 20, 1966 |
| Davis | July 24, 1966 | July 11, 1966 |
| Gullo | July 24, 1966 | None |
| Rosenblum | October 31, 1966 | October 17, 1966 |
| Cartabuke | December 5, 1966 | November 25, 1966 |
| Gold | May 12, 1968 | April 26, 1968 |
| Amato | July 26, 1971 | July 7, 1971 |

12. See footnote 16 infra.

13. See footnote 29 infra.

provisions permit it to fix the maximum resale price of its papers without violating the antitrust laws. Plaintiffs, on the other hand, vigorously oppose this reading of these two statutes and have advanced four reasons for the proposition that they do not exempt the defendants' conduct from § 1 of the Sherman Act.

In order properly to evaluate these competing positions, some preliminary, perhaps elementary, observations are necessary. The Sherman Act, as originally drawn, forbade resale price maintenance contracts whether horizontal or vertical, see e. g., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U. S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); United States v. Bausch & Lomb Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1943); United States v. So-cony-Vacuum Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Trenton Potteries Co., 273 U.S.

392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

The Miller-Tydings Act,[14] passed in 1937, amended the Sherman Act to permit such contracts where they were legal under state law, provided that they were not contracts " . . . between manufacturers, or between wholesalers, or . . . between persons, firms or corporations in competition with each other." In 1951 the Supreme Court held that it did not apply to price-fixing agreements made binding by state law on "non-signers" of such agreements. Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).[15]

Responding to that decision, Congress passed the McGuire Act Amendment to Section 5(a) of the Federal Trade Commission Act.[16] The

---

14. The Miller–Tydings resale price maintenance act, 50 Stat. 693 (1937), 15 U.S.C. § 1, was enacted as an amendment to Section 1 of the Sherman Act and Section 5 of the Federal Trade Commission Act. Taking the form of a proviso in Section 1 of the Sherman Act it states:

"Provided, That nothing herein contained shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears . . . the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law or public policy now or hereafter in effect in any State, Territory or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 5, as amended and supplemented, of the Act entitled "An Act to create a Federal Trade Commission, . . .

Provided further, That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or be-

tween wholesalers, or between brokers or between factors, or between retailers or between persons, firms or corporations in competition with each other. . . ."

15. Prior to *Schwegmann* many statutes permitted a trademark owner to require retailers who had notice of such agreements to observe resale price maintenance. In that case, the Court examined the Miller-Tydings Act and concluded that Congress had intended the words "contracts or agreements" to be used "in their normal and customary meaning", and to cover only agreements whereby the retailer voluntarily agreed to be bound by the resale price restrictions. It held that state resale price laws could not be applied to non-signers—"recalcitrants . . . dragged in by the heels and compelled to submit to price fixing." 341 U.S. at 390, 71 S.Ct. at 748.

16. 66 Stat. 631, 15 U.S.C. § 45 (1952). The Act provides in relevant part:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it is the purpose of this Act to protect the rights of States under the United States Constitution to regulate their internal affairs and more particularly to enact statutes and laws, and to adopt policies, which authorize contracts and agreements prescribing minimum or stipulated prices for the resale of commodities and to extend the minimum or stip-

McGuire Act not only reaffirmed the policy of the Miller-Tydings Amendment,[17] but also eliminated the restrictive effect of the Supreme Court's decision in *Schwegmann* by permitting states to enact laws for the enforcement of fair trade contracts against non-signers.[18] However, like the Miller-Tydings Amendment, it legalizes only verti-

cal price maintenance contracts which are lawful in the state where the resale is made. Consequently, any analysis of The News' resale price maintenance system must begin with an examination of the New York Fair Trade Law.

The Feld-Crawford Act, as the New York Fair Trade Law [19] is commonly referred to, was modeled after the Califor-

ulated prices prescribed by such contracts and agreements to persons who are not parties thereto. It is the further purpose of this Act to permit such statutes, laws, and public policies to apply to commodities, contracts, agreements, and activities in or affecting interstate or foreign commerce.

'Sec. 2. Section 5(a) of the Federal Trade Commission Act, as amended, is hereby amended to read as follows:

'Sec. 5(a)(1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful.

'(2) Nothing contained in this Act or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

'(3) Nothing contained in this Act or in any of the Antitrust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia, which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements, whether the person so advertising, offering for sale, or selling is or is not a party to such a contract or agreement, is unfair competition and is actionable at the suit of any person damaged thereby.

'(4) Neither the making of contracts or agreements prescribed in paragraph (2) of this subsection, nor the exercise or enforce-

ment of any right or right of action as described in paragraph (3) of his subsection shall constitute an unlawful burden or restraint upon, or interference with, commerce.

'(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. . . .' "

The McGuire Act did not repeal the Miller-Tydings Amendment to the Sherman Act and there are, therefore, two federal laws presently exempting state fair-trade acts from the prohibitions of the federal antitrusts. It is apparent, however, that the McGuire Act was intended to supersede the Miller-Tydings Amendment. See Callman, Unfair Competition, Trademarks and Monopolies, § 22.2.

17. In order to safeguard interbrand competition, the Act prohibits horizontal price-fixing agreements and denies fair-trade contracts its protection unless the fair-traded product is "in free and open competition with commodities of the same general class." Thus, the Act contemplates the elimination of intrabrand price competition and relies for protection of the public interest upon interbrand price competition.

18. The Report of the House Committee on Interstate Commerce which accompanied the McGuire Act declared that:

"The primary purpose of the bill is to reaffirm . . . that the application and enforcement of State fair-trade laws—including the non-signer provisions of such laws—. . . shall not constitute a violation of the Federal Trade Commission Act or the Sherman Antitrust Act. This reaffirmation is made necessary because of the decision of a divided Supreme Court in Schwegmann v. Calvert Distillers Corporation . . ."

19. N.Y.Gen.Bus.L. § 369–a et seq.

nia Fair Trade Act of 1933.[20] Section 369–a permits vertical price fixing by authorizing the producer or owner of any brand-name commodity "which is in fair and open competition with commodities of the same general class" to fix by contract, a stipulated resale price and to require any dealer who may resell it to agree not to do so at other than the stipulated price. Section 369–b characterizes deviation from the agreement as unfair competition actionable by any person damaged, whether or not the violator is a party to the contract. Section 369–c completes the statutory scheme by excluding horizontal resale price maintenance agreements from the operation of the statute.

The News' franchise agreement provides, among other things, that the franchise dealer shall purchase from The News on each day of publication a sufficient number of copies of the newspaper to supply "all single copy home delivery subscribers within his territory" and shall supervise the delivery and resale of the newspapers to such regular subscribers at "no more than" the regular home delivery price established by The News.

Plaintiffs claim this provision is not within the protection of the Feld-Crawford and McGuire Acts and violates Section 1 of the Sherman Act. They allege that:

(1) The News is not in fair and open competition with commodities of the same general class;

(2) The News is controlling not merely the resale prices, but also the home delivery service charge;

(3) The Feld-Crawford and McGuire Acts only permit minimum resale prices to be fixed, not maximum resale prices; and

(4) The franchise agreement is an illegal horizontal agreement between wholesalers.

Plaintiffs' contention that The News is not in "free and open competition with commodities of the same general class" can be disposed of briefly.

The existence of "free and open competition" is a condition precedent to the legality of any resale price maintenance system.[21] See 1 Callman, Unfair Competition Trademarks and Monopolies § 23.3(a) (3rd Ed. 1971). This requirement is designed to assure that fair trade is limited to products which face sufficient interbrand competition to prevent them from eliminating horizontal price competition.[22] See Eastman Kodak Co. v. F.T.C., 158 F.2d 592, 594 (2d Cir. 1946), cert. denied, 330 U.S. 828, 67 S.Ct. 869, 91 L. Ed. 1277 (1947); Herman, Free and Open Competition, 9 Stan.L.Rev. 323 (1957); Note, 105 U.Pa.L.Rev. 415, 417 (1957).

Though the case law in this area is sparse, the decisions on point establish that a product is in "free and open competition" when there are other products which are purchased by consumers

20. See Bristol-Myers Co. v. Picker, 302 N.Y. 61, 66, 96 N.E.2d 177 (1950). The constitutionality of the California Act, (Cal.Laws 1931, Ch. 278, Deering's Gen.Laws of Cal., 1931, Act 8782, as amended, Cal.Laws 1933, Ch. 260, Deering's Gen.Laws Supp.1933, Act 8782), was upheld in Pep Boys, Manny, Moe & Jack v. Pyroil Sales. Co., Inc., 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122 (1936).

21. The quoted language is used in both the McGuire Act and the Miller-Tydings Act. The same requirement appears with a minor variation in the Feld-Crawford Act which permits resale price maintenance contracts relating to commodities in "fair and open competition."

22. Though fair trade acts expressly sanction the elimination of intrabrand price competition, they seek to preserve interbrand competition by prohibiting horizontal price fixing and denying protection to products which are not in free and open competition with commodities of the same general class.

In this connection, the legislative history of the Miller-Tydings Act is instructive. It clearly indicates that Congress sought to validate resale price maintenance agreements only with respect to commodities which are in effective competition with similar commodities. 81 Cong.Rec. 7495 (1937) (remarks of Senator Tydings).

for the same purpose.[23] See Columbia Records v. Goody, 278 App.Div. 401, 105 N.Y.S.2d 659 (1st Dept. 1951); General Electric Co. v. S. Klein-on-the-Square, 121 N.Y.S.2d 37, 49–50 (Sup., 1953). See also Glen Raven Knitting Mills v. Sanson Hosiery Mills, 189 F.2d 845, 854 (4th Cir. 1951); Fulda, Resale Price Maintenance, 21 U.Chi.L.Rev. 175, 198 (1954).

■ Applying this test to the case at bar it becomes clear that The News is in free and open competition with the New York Times and a number of local newspapers in the suburban areas. Indeed, to meet this competition The News has been forced to embark on an aggressive home delivery system and to publish a number of suburban or zone sections.[24]

Plaintiffs' second contention is that The News is "not merely controlling resale prices, but . . . is actually controlling the home delivery service charge." This, they maintain, is not permitted by the Feld-Crawford Act. The only authority cited is a brief passage from Bristol-Myers Co. v. Picker, 302 N.Y. 61, 96 N.E.2d 177 (1950).[25]

The *Bristol-Myers* case involved a drug store and other retail establishments which, as members of the "Lyn-brook Dividend Club", issued "cash register receipts" to their customers with all sales. These receipts were redeemable in merchandise for 2½% of the sale at any store in the club. Bristol-Myers contended that this amounted to an illegal reduction of its fair trade price and sued for an injunction.[26]

The New York Court of Appeals held that this practice constituted price cutting within the meaning of the Feld-Crawford Act and that Bristol-Myers was entitled to the relief requested, noting that:

"The challenged scheme must be differentiated from types of service such as free parking, self-service, care of infants, entertainment, free delivery and the like . . . These other types of service . . . [are] too remote from the pricing element to come within the statute's prohibition." 302 N.Y. at 68, 96 N.E.2d at 180.

■ Thus, rather than supporting plaintiffs' position, *Bristol-Myers* would seem to indicate that nothing in the Feld-Crawford Act prevents The News from fixing the home delivery price of its paper.[27]

23. Eastman Kodak v. F. T. C., 158 F.2d 592 (2d Cir. 1946), cert. denied, 330 U.S. 828, 67 S.Ct. 869, 91 L.Ed. 1277 (1947), cited by plaintiffs, does not hold to the contrary. In that case, the Second Circuit affirmed an F. T. C. order which was based on the Commission's finding that color film is not in the same general class as black and white film. This decision is of little precedential value because the Commission's findings are conclusive if they are supported by any evidence. See F. T. C. v. Standard Education Society, 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141 (1937).

24. These suburban sections are distributed as part of The News in specific geographic areas and carry local news and advertising. Currently The News produces special sections for the following areas: Manhattan, Bronx-Westchester, Passaic-Bergen, Newark, New Jersey, Brooklyn, Queens and Long Island, and Nassau-Suffolk.

25. The passage reads:
"Considered as a method of advertising, the challenged scheme must be differentiated from types of service such as free parking, self-service, care of infants, entertainment, free delivery and the like, which we are not presently concerned. These other types of services have no direct relation to the article purchased or the price paid. They are completely separated and too remote from the pricing element to come within the statute's prohibition." 302 N.Y. at 68, 96 N.E.2d at 180.
Plaintiffs made no attempt to develop any argument in support of their position and rely exclusively on this passage.

26. Bristol-Myers had fixed minimum retail prices for its products pursuant to the New York Fair Trade Law and had expressly provided against sales below the established prices "by any means, device, combination sale, trading stamp, free goods, discount, rebate, or other allowance . . ." See Note, 63 Harv.L.Rev. 366, 367 (1949).

27. It is significant that The News' franchise agreement makes no mention of service charges. Instead, it provides that the franchise dealer supervise the delivery and resale

■ Plaintiffs' third contention is that the Feld-Crawford Act does not authorize the fixing of maximum resale prices. Here, they argue that the New York decisions discussing the purposes for which the statute was enacted [28] and the statute read as a whole [29] require the conclusion that the Act only authorizes the fixing of minimum resale prices.

Although there is a dearth of decisional law in this area, and no square holding on point, what few cases there are lend support to the view that the terms "minimum" and "stipulated" are not synonymous, and that both the McGuire Act [30] and the Feld-Crawford Act authorize the setting of either a minimum or a stipulated (absolute) price. See Schwegmann Bros. v. Calvert Corp., 341 U.S. 384, 388, 71 S.Ct. 745, 95 L.Ed. 1035 (1951); Graham v. Triangle Publications, Inc., 233 F.Supp. 825, 830–831 (E.D.Pa.1964), aff'd per curiam 344 F. 2d 775 (3d Cir. 1965); Mead Johnson & Co. v. West Chester Discount, Health & Vitamin Center, Inc., 212 F.Supp. 310 (E.D.Pa.1962). See also General Electric Co. v. S. Klein-on-the-Square, Inc., 121 N.Y.S.2d 37 (Sup.Ct.1953).

Thus, in *Schwegmann,* supra, the Supreme Court considered a provision in the Louisiana Fair Trade Law which prevented a buyer from reselling "except at the price stipulated by the vendor." After contrasting it with the provision in the Miller-Tydings Act which provides for contracts or agreements prescribing "minimum prices", the Court concluded that " . . . Louisiana law sanctions the fixing of maximum as well as minimum prices . . . " 341 U.S. at 388, 71 S.Ct. at 747.[31]

of the newspapers to subscribers at "no more than" the regular home delivery price established by The News.

**28.** Plaintiffs rely principally upon General Electric v. Masters, 307 N.Y. 229, 120 N.E. 2d 802 (1954), Bristol-Myers Co. v. Picker, 302 N.Y. 61, 96 N.E.2d 177 (1950), and Bourjois Sales Corp. v. Dorfman, 273 N.Y. 167, 7 N.E.2d 30 (1937).

**29.** Section 369–a(1) of the Feld-Crawford Act permits the producer of a commodity which bears its trademark, brand or name, and which is in "fair and open competition with commodities of the same general class produced by others" to *"stipulate"* the price at which its buyer may resell and also to provide that the buyer will not, in turn, resell except at the *price stipulated.*
Section 369–b provides that willfully and knowingly advertising, offering for sale or selling a commodity at less than the price stipulated by any contract pursuant to § 369–a is unfair competition and actionable by any person damaged thereby.
In support of their argument, plaintiffs stress the fact that § 369–b creates a cause of action only *against those who knowingly and willfully sell* "at less than the price stipulated in any contract" pursuant to § 369–a. However, the fact that § 369–b is silent with respect to enforcement against parties who sell *above* the stipulated price is not dispositive of this issue. In the ordinary situation there is no need for enforcement of maximum prices since anyone selling at a price higher than a generally observed maximum price would quickly lose sales as a nat-

ural consequence of competition. See Fulda, Resale Price Maintenance, supra, at 190. Cf. Adams, Resale Price Maintenance: Fact and Fancy, 64 Yale L.J. 967, 972 (1955).

**30.** Paragraph 2 of the McGuire Act provides in pertinent part that nothing contained in the Antitrust Acts "shall render unlawful any contracts or agreements prescribing *minimum or stipulated prices,"* lawful under State law.

**31.** This dicta assumes even greater significance when the language of paragraph 2 of the McGuire Act is examined. In permitting "contracts or agreements prescribing *minimum or stipulated* prices," Congress clearly intended to make lawful a type of contract not covered under the Miller-Tydings Act. See H.R. Report No. 1437, 72nd Congress, 2d Session, 1952, at pp. 5–6; Fulda, Resale Price Maintenance, 21 U.Chi.L.Rev. 175, 190 (1954). Since Congress had the benefit of the Supreme Court's construction of the Louisiana statute, the conclusion is inescapable that it intended to sanction "the fixing of maximum as well as minimum prices."
Furthermore, to read "stipulated" as synonymous with "minimum" would violate the cardinal rule that "significance and effect shall, if possible, be accorded to every word" in a statute. Washington Market Co. v. Hoffman, 101 U.S. 112, 115, 25 L.Ed. 782 (1879). See also United States v. Menasche, 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955); Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932).

Similarly, in Mead Johnson & Co. v. West Chester Discount Health & Vitamin Center, Inc., supra, the court construed § 1 of the Pennsylvania Fair Trade Act which provides "[t]hat the buyer will not resell such commodity, except at the price stipulated by the vendor." It found " . . . that the fixing of a minimum retail price is an exercise of some, but not all, of the authority conferred by the statutory right to set a stipulated price." 212 F.Supp. at 313. This language was quoted with approval in Graham v. Triangle Publications, Inc., supra.

Moreover, despite plaintiffs' characterization of the New York decisions on this question, not one holds or states by way of dicta that the *sole* purpose of the New York legislature in enacting the Feld-Crawford Act was to allow for the maintenance of minimum resale prices.

Furthermore, contrary to plaintiffs' assertion, at least one New York decision, General Electric Co. v. S. Klein-on-the-Square, Inc., supra, clearly holds that it authorizes agreements whereby "the buyer agrees to sell neither above nor below" a stipulated price.

> "There of course is a difference between preventing under-selling or price-cutting and preventing price gouging by selling above a designated price, and it may be that some fair trade laws forbid both while others forbid only one or the other. It is unnecessary to go into that. The N.Y. statute forbids selling at less than the price stipulated in a contract, and a price is stipulated in a contract by which the buyer agrees not to sell below a stated price as well as in a contract by which the buyer agrees to sell neither above nor below that price.
>
> \* \* \* \* \* \*
>
> " . . . a price is stipulated or prescribed in a contract by which the buyer agrees not to sell below a stated price as well as in a contract by which the buyer agrees to sell neither above nor below that price, or, in the phrase defendant likes 'at that price'." 121 N.Y.S.2d at 46, 47.

In the absence of any square holding to the contrary, I find the reasoning of the *General Electric* case persuasive. Accordingly, I reject plaintiffs' contention that the Feld-Crawford Act permits only the fixing of minimum prices.

Plaintiffs' final argument is that the franchise agreement is one between wholesalers and, therefore, is not protected by the McGuire Act. They contend that The News is a wholesaler in that it sells its newspapers directly to newsstand and franchise dealers and that the franchise dealers are also wholesalers because they, in turn, sell, at wholesale, to the carrier boys.

The News, on the other hand, denies that such direct sales make it a wholesaler. It contends that it is on a different functional level than its franchise dealers and argues that any agreement between them is vertical. It asserts that nothing in the Feld-Crawford Act prohibits an integrated manufacturer-wholesaler from making fair trade contracts with independent wholesalers.

For purposes of this opinion I am prepared to accept this construction of the New York Fair Trade Laws. Cf. Eastman Kodak Co. v. Schwartz, 133 N.Y.S.2d 908 (Sup.Ct.1954); Gillette Safety Razor Co. v. Green, 167 Misc. 251, 3 N.Y.S.2d 822, aff'd, 258 App.Div. 723, 15 N.Y.S. 142 (1938). However, whatever reach the New York courts might give the New York Fair Trade Laws is subject to McGuire Act limitations. See Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398, 401 (2d Cir.), cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968); Sunbeam Corp. v. Masters, Inc., 157 F.Supp. 689, 691 (S.D.N.Y.1957).

That Act expressly condemns "horizontal" price fixing agreements. Paragraph (a)(5) provides that:

> "Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment of minimum or stipulated resale prices on any commodity referred to in paragraph (2)

of this subsection, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other." 15 U.S.C. § 45(a)(5).

See generally, Callman, Unfair Competition, Trademarks & Monopolies § 23.3(c).

In United States v. McKesson & Robbins, 351 U.S. 305, 76 S.Ct. 937, 100 L. Ed. 1209 (1956), the Supreme Court held that a manufacturer-wholesaler could not enter into fair trade agreements with independent wholesalers who competed with its wholesale division on the ground that both the Miller-Tydings and McGuire Acts specifically exclude from their antitrust exemption all agreements " . . . between wholesalers . . . in competition with each other." In reaching this result, the Court rejected McKesson's argument that in contracting with independent wholesalers it acted solely as a manufacturer selling to buyers rather than as a competing wholesaler. It refused to compartmentalize McKesson's business and stated that "the statutes provide no basis for sanctioning the fiction of McKesson . . . acting only as a manufacturer when it concludes 'fair trade' agreements with competing wholesalers. These were agreements between wholesalers." 351 U.S. at 312, 76 S.Ct. at 941.

The *McKesson* decision cast substantial doubt on the legality of fair trade agreements between vertically integrated manufacturers and independent wholesalers and retailers; Herman, Fair Trade and McKesson & Robbins, 44 Cal. L.Rev. 853, 857 (1956); Note, 46 Georgetown L.J. 166, 175 (1957); Note, 24 Univ. of Chi.L.Rev. 533, 538 (1957);

see also Weston, Resale Price Maintenance and Market Integration: Fair Trade or Foul Play?, 22 Geo.Wash.L. Rev. 658 (1954), but did not completely clarify the meaning of paragraph 5. As recently as 1967 it was unclear whether the final phrase of the section, "in competition with each other", modifies only the immediately preceding phrase, "between persons, firms, or corporations", or also modifies the other preceding phrases, such as "between manufacturers", "between retailers" and "between wholesalers". Compare Johnson & Johnson v. Avenue Merchandise Corp., 193 F.Supp. 282, 287 (S.D.N.Y.1961), with Upjohn Company v. Charles Labs, Inc., 277 F.Supp. 445 (S.D.N.Y.1967) and Parke, Davis & Co. v. Rocket Drugs, Inc., 214 F.Supp. 937, 938 (S.D.N.Y. 1963). See also, Esso Standard Oil Co. v. Secatore's Inc., 246 F.2d 17, 21 (1st Cir.), cert. denied, 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).[32]

In Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398 (2d Cir.), cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L. Ed.2d 275 (1968), the Second Circuit considered this specific question and concluded that "the legislative history [indicates] that it is immaterial whether a manufacturer-retailer and a signing retailer are in actual competition." 396 F.2d at 403. Accord, Ar-Ex Products Co. v. Capital Vitamin & Cosmetic Corp., 351 F.2d 938 (1st Cir. 1965).

In *Janel,* the defendant was a widely known manufacturer of perfumes and other toiletries which sold its products directly to retail outlets pursuant to a fair trade agreement. The plaintiff, Janel Sales Corp., operated a chain of discount drug stores in New York City, but was not a direct account of Lanvin. It acquired Lanvin's products from other

---

32. If the phrase "in competition with each other" modifies all the preceding phrases there must be a showing of some quantum of competition between the vertically integrated manufacturer and the signing retailer or wholesaler before the agreement falls within the scope of paragraph (5). See Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398, 403 (2d Cir.), cert. denied, 363 U.

S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968). However, if it does not, the presence or absence of competition is immaterial and any contract "between manufacturers, or between producers, or between wholesalers . . . or between retailers" is unlawful. See Note, 43 N.Y.U.L.Rev. 997, 1002 (1968).

Either interpretation is possible.

retail stores for less than the stipulated resale price and sold them at a discount. Lanvin successfully sued in the state court to enjoin Janel from selling Lanvin perfumes below the fair trade price. Janel countered with a federal action against Lanvin attacking the legality of the fair trade contract underlying the state injunction.

It charged that certain "promotional" and "accommodation" sales made by Lanvin were retail sales which, as a matter of law, deprived Lanvin's fair trade agreements of the protection of the McGuire Act. Lanvin, on the other hand, contended that its "promotional" and "accommodation" sales did not render it a "retailer" or a "competitor". The Court of Appeals held that these assertions raised triable issues of fact.

Though it did not supply a precise standard for determining whether a party is a "retailer" or a "competitor" within the terms of the McGuire Act, it followed McKesson's teaching that the words of the statute are to be read "in their normal and customary meaning." United States v. McKesson & Robbins, supra, 351 U.S., at 312, 76 S.Ct., at 941; see also, Schwegmann Bros. v. Calvert Corp., 341 U.S. 384, 388, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

More importantly, the Court of Appeals held that any manufacturer or producer who maintains retail or wholesale outlets of his own (i. e., one who engages in any direct selling aside from "promotional" or "accommodation" sales) is a "retailer" or "wholesaler" and is therefore not permitted to establish fair trade agreements with any other retailer or wholesaler.

Applying these principles to the case at bar, the conclusion is inescapable that The News is a wholesaler, Cf. Dahl v. Hearst Corp., 1972 Trades Cases ¶ 74,196 (C.D.Cal.), within the normal and customary definition of "wholesaler" as one whose business is the selling of goods in gross to retail dealers. See F. T. C. v. Mennen Co., 262 U.S. 759, 43 S.Ct. 705, 67 L.Ed. 1219 (1923); Harris v. Hammond, 51 F.Supp. 91, 94 (S.D. Ga.1943), aff'd, 145 F.2d 333 (5th Cir. 1944); Zehring v. Brown Materials, 48 F.Supp. 740, 743 (S.D.Cal.1943); Veazey Drug Co. v. Bruza, 169 Okl. 418, 37 P.2d 294 (1934); Monoco Oil Co. v. Town of Pittsford, Co. of Monroe, 59 Misc.2d 750, 300 N.Y.S.2d 488, 493 (1969).

■ The News distributes its newspapers to retailers through mixed channels. It acts as a wholesaler by making direct sales to retailers (e. g., street sale dealers) and also sells through independent wholesalers. In so doing, its status as a producer or manufacturer is changed into that of a manufacturer-wholesaler. Janel Sales Corp. v. Lanvin Parfums, Inc., supra; Ar-Ex Products Co. v. Capital Vitamin & Cosmetic Corp., supra, 351 F.2d, at 940; Dahl v. Hearst Corp., supra. Cf. United States v. McKesson & Robbins, supra. Since The News' franchise dealers also function as wholesalers in selling to their carrier boys, it follows that their relationship with The News is horizontal and not vertical. Therefore, The News and its franchise dealers are both wholesalers within the meaning of the McGuire Act and they are not free to enter into price fixing agreements which affect "interstate commerce" as that term is used in the Sherman Act. United States v. McKesson & Robbins, supra; Janel Sales Corp. v. Lanvin Parfums, Inc., supra.

Accordingly, I hold that The News' franchise agreement is not immunized from the Sherman Act by the McGuire Act and that it entered into illegal price maintenance agreements with its dealers. See United States v. Socony-Vacuum Oil Co., supra; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., supra.

■ This result is a harsh one. Nonetheless, it is the result dictated by the Supreme Court's admonition that the exemption accorded by Congress in the

Miller-Tydings and McGuire Acts be narrowly construed.[33]

 Plaintiffs also contend that The News is a retailer within the meaning of the McGuire Act because it distributes its newspaper through the mails. Relying on *Janel Sales Corp.* supra, they maintain that these "retail" sales place it on the same functional level as its carrier boys and therefore bar it from fixing the prices at which they sell The News. This contention can be disposed of briefly.

In the six month period ending September 30, 1971, The News had only 391 mail subscribers in the entire metropolitan area.[34] These subscribers received the paper a day or more after the issue date and paid a higher price than the newsstand or home delivery price. Generally, only clipping services, libraries, or persons without access to newspapers subscribe by mail.

In my view, these sales must be classified as "legitimate accommodation sales" and common sense requires their exclusion in determining whether The News is functionally a retailer. See Janel Sales Corp. v. Lanvin Parfums, Inc., supra, 396 F.2d, at 403; General Electric Co. v. Hess Brothers, Inc., 155 F.Supp. 57, 62 (E.D.Pa.1957).[35] In any event, these sales are de minimus. See Janel Sales Corp. v. Lanvin Parfums, Inc., supra; Johnson & Johnson v. Avenue Merchandise Corp., supra, 193 F.Supp., at 289–290.

## V.

The News contends that its refusal to deal with plaintiffs[36] is totally unrelat-

---

33. See e. g. United States v. McKesson & Robbins, supra, 351 U.S., at 316, 76 S.Ct., at 944:

> "Congress has marked the limitations beyond which price fixing cannot go. We are not only bound by those limitations but we are bound to construe them strictly, since resale price maintenance is a privilege restrictive of a free economy."

34. This represented about one-hundredth of 1% (.0001) of its total average paid circulation.

35. In Janel Sales Corp. v. Lanvin Parfums, Inc., supra, the Second Circuit indicated that a retail sale could be identified by considering "the actual size of the sale, the dollar value of the sale, and the number of similar sales that are made." 396 F.2d at 403. Applying this test to The News' mail subscriptions, it becomes clear that they do not rise to the level of "retail sales."

36. Plaintiffs Freilich, Rosenblatt, Theall, Salant and Cestaro continue to receive copies of The News. Though plaintiff Theall testified that he observed a franchise dealer operating on his route, it is undisputed that there is no franchise dealer in his area or any adjoining area. Since all of these plaintiffs operate in areas in which the franchise system has not been instituted, they have no standing to challenge any of The News' policies or any of the provisions of the franchise agreement. See Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826, reh. denied, 401 U.S. 1014, 91 S.Ct. 1250, 28 L.Ed.2d 553 (1971); SCM

Corp. v. Radio Corp. of America, 407 F.2d 166 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969). Cf. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). The same is true of plaintiffs Ellis, Marston and Silverstein who continued to receive The News until they sold their routes. All of these plaintiffs have failed to show that their competitive positions have been injured and consequently, they fail to make out a claim for relief under the antitrust laws. GAF Corporation v. Circle Floor Co., Inc., 463 F.2d 752 (2d Cir. 1972), cert. dismissed, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973).

Plaintiffs Hand, Shank, Greenberg and Holman also continue to receive copies of The News even though they operate in areas in which the franchise system has been instituted. Plaintiff Fox was in the same position before he sold his route. Accordingly, these plaintiffs do not challenge The News' decision to terminate sales to the other plaintiffs. Instead, they contend that they have been injured by the provision in the franchise agreement which requires the franchise dealers to resell The News at stipulated prices and by the price discrimination practiced by The News against them. They allege that the franchise agreement substitutes the judgment of The News for the forces of the competitive market and severely limits their ability to compete and survive. Cf. Albrecht v. Herald Co., 390 U.S. 145, 152, 88 S.Ct. 869, 19 L. Ed.2d 998 (1968); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

668

ed to any of the provisions of the franchise agreement and is merely an exercise of its right to choose its customers and its methods of distribution. It claims that its decision to discontinue selling to plaintiffs was a business judgment that the institution of a franchise system would increase its circulation and provide better and more efficient service to its home delivery subscribers. Accordingly, it argues that this case is controlled by United States v. Colgate, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and other cases holding that a unilateral decision by a producer to substitute one distributor for another is not actionable under the antitrust laws.[37]

Plaintiffs, on the other hand, contend that The News' decision to terminate sales to them was part of an effort to enforce an illegal price maintenance scheme.[38] They allege that The News combined with its franchise dealers and others to prevent them from acquiring copies of The News in order to protect the franchise dealers from intrabrand competition and to allow The News to control the home delivered price of its paper.[39]

In *Colgate,* supra, the Supreme Court recognized the general right of a businessman to select his customers and refuse to deal.[40] However, in successive

Since the record amply demonstrates the validity of this contention, they have established all the elements of a Sherman Act violation and are entitled to recover treble damages regardless of whether The News could lawfully have terminated sales to them or to the other plaintiffs. See United States v. Parke, Davis & Co., infra; GAF Corporation v. Circle Floor Co., Inc., supra.

37. The News cites many cases for the proposition that a producer is free to replace one distributor with another. See e. g., United States v. Arnold, Schwinn & Co., 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Anaya v. Las Cruces Sun News, 455 F.2d 670 (10th Cir. 1972); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, reh. denied, 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415 (1970); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283, 286–87 (6th Cir. 1963). In doing so, it argues that "[t]he record clearly shows that any adverse economic impact on plaintiffs' businesses is attributable solely to The News' termination of sales to such plaintiffs." Brief for Defendants at 20. Thus, it contends that even if the franchise agreement is illegal, the plaintiffs were not injured by reason of anything in it and that the only private parties with standing to challenge it are the franchise dealers.

38. The News concedes that this allegation raises the "most critical issue" in the case. The reason is clear.

It is well settled that any attempt by a producer to secure resale price maintenance which goes beyond the "mere announcement of his policy" regarding prices and "the simple refusal to deal" is unlawful. United States v. Parke, Davis & Co., 362 U.S. 29,

44–45, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). See also, Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) Simpson v. Union Oil Co., 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). Cf. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 78 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, reh. denied, 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415 (1970). Thus, if The News terminated sales to the plaintiffs pursuant to an illegal price fixing scheme, they have been injured by reason of something "forbidden in the antitrust laws." See Interphoto Corporation v. Minolta Corporation, 295 F.Supp. 711, 721 (S.D.N.Y.), aff'd, 417 F.2d 621 (2d Cir. 1969). Cf. Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); United States v. General Motors, 384 U.S. 127, 146–148, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847, 877–82 (1955).

39. Plaintiff Rathsam relies solely on these allegations. He acquired his route from a cut-off route dealer and never sought to purchase directly from The News. However, he testified that he was subjected to the same type of predatory conduct that the other route dealers experienced and therefore claims that he was injured by reason of the illegal combination to fix prices.

40. In *Colgate,* the defendant manufacturer had secured substantial control over resale pricing by wholesalers and retailers by announcing that it would not deal further with price cutters. The government obtained an indictment charging an unlawful combination under Section 1 of the Sherman Act. The Supreme Court sustained dismissal because it did "not charge Colgate with selling its

decisions, the teaching of that case has been considerably narrowed. See e. g., Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); United States v. Parke, Davis & Co., 363 U.S. 29, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960).

In United States v. Parke, Davis & Co., supra, the defendant sought to maintain resale prices by refusing to sell its products to retailers who resold below its suggested prices. A similar policy was enunciated with respect to its wholesalers who were informed that it would refuse to sell them if they cut prices or sold to price-cutting retailers. when certain retailers persisted in cutting prices, the company and the wholesalers stopped supplying them. Subsequently, it informed the price-cutters that their source of supply would be reopened if they would indicate a willingness to cooperate; when the retailers agreed, sales were resumed. The government sought an injunction against these practices and the company defended on the ground that its conduct was legal under the *Colgate* doctrine.

Looking at this series of allegedly unilateral acts, the Supreme Court found that Parke, Davis had embarked upon a program to promote compliance with its suggested resale prices which "plainly exceeded the limitations of the Colgate doctrine" and which constituted an unlawful combination in restraint of trade. The Court stated that:

". . . an unlawful combination is not just such as arises from a price maintenance *agreement,* express or implied; such a combination is also

organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy . . .

When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices . . . he has put together a combination in violation of the Sherman Act." 363 U.S. at 43, 44, 80 S.Ct. at 511.

The scope of *Parke, Davis* was somewhat clarified in Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed. 2d 98 (1964). There, the plaintiff, a retail service station lessee, signed a consignment agreement for a term concurrent with his lease under which Union set the prices at which he would sell gasoline to the public.[41] When he sold gasoline below the fixed price to meet competition, Union refused to renew his lease.

The Court found that Union had used the threat of termination of the lease as the means of enforcing its pricing scheme and held Union's consignment system illegal. In rejecting the claim that its termination of the plaintiff's dealership was a mere refusal to deal within the meaning of *Colgate,* the Court said:

"We made clear in United States v. Parke, Davis & Co., 362 U.S. 29, [80 S.Ct. 503, 4 L.Ed.2d 505], that a supplier may not use coercion on its retail outlets to achieve resale price maintenance. We reiterate that view, adding that it matters not what the coercive

---

products to dealers under agreements which obligated the latter not to resell except at prices fixed by the company." 250 U.S. at 307, 39 S.Ct. at 468. In doing so, the Court noted that:
"The purpose of the Sherman Act . . . to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer . . .

freely to exercise his own discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell." 250 U.S. at 307, 39 S.Ct. at 468.

41. The agreement plaintiff signed was Union's standard retail consignment agreement and provided that his compensation was to be on a commission basis 377 U.S. at 15, 84 S.Ct. 1051.

device is. United States v. Colgate, 250 U.S. 300 [39 S.Ct. 465, 63 L.Ed. 992] as explained in *Parke, Davis*, 362 U.S. at 37 [80 S.Ct. 503, 4 L.Ed.2d 505], was a case where there was assumed to be no agreement to maintain retail prices. *Here we have such an agreement*; it is used coercively, and, it promises to be equally if not more effective in maintaining gasoline prices than were the *Parke, Davis* techniques in fixing monopoly prices on drugs." 377 U.S. at 17, 84 S.Ct. at 1055. (Emphasis added).

*Union Oil* was followed by United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966),[42] in which the Court reiterated its view that agreements or combinations to maintain prices are unlawful per se no matter what form they take.

> "The protection of price competition from conspiratorial restraint is an object of special solicitude under the antitrust laws. We cannot respect that solicitude by closing our eyes to the effect upon price competition of the removal from the market, by combination or conspiracy, of a class of traders. Nor do we propose to construe the Sherman Act to prohibit conspiracies to fix prices at which competitors may sell, but to allow conspiracies or combinations to put competitors out of business entirely." 384 U.S. at 148, 86 S.Ct. at 1332.

The most recent case interpreting *Colgate* is Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). A newspaper publisher announced that it would compete with or refuse to deal with any distributor who refused to abide by its suggested resale price. When Albrecht raised its price over the suggested maximum, it hired an independent sales solicitation firm (Milne) to contact his customers and offer delivery at a lower rate. As a result, some of Albrecht's customers switched to direct delivery by the publisher, and it subsequently turned these customers over to another dealer (Kroner) with the understanding that he might have to return them to Albrecht if he accepted the maximum price ceiling.

In holding that the publisher had put together a combination to fix resale prices which was per se illegal under the Sherman Act, the Court rejected the defendant's contention that its conduct was wholly unilateral.

> "§ 1 of the Sherman Act . . . covers combinations in addition to contracts and conspiracies, express or implied. The Court made this quite clear in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L. Ed.2d 505 (1960), where it held that an illegal combination to fix prices results if a seller suggests resale prices and secures compliance by means in ad-

---

42. In United States v. General Motors, supra, the government brought a civil action under Section 1 of the Sherman Act against General Motors Corporation and three associations of Chevrolet dealers in the Los Angeles area to enjoin them from conspiring to prevent certain franchised dealers from maintaining sales relationships with discount houses. As a result of pressure from dealers who were losing sales to the discount houses, General Motors advised all its franchisees that selling cars to discount houses might constitute a violation of the franchise agreement, and elicited promises from them to desist from further sales. The defendant associations jointly financed the policing of these promises and, as violations were discovered, General Motors enforced compliance.

Finding a "classic conspiracy in restraint of trade", the Court held the arrangement unlawful per se.

"The principle of these cases is that where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. * * * Exclusions of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system [of distribution] * * *." 384 U.S. at 146, 86 S.Ct. at 1331.

dition to the 'mere announcement of his policy and the simple refusal to deal . . . .'

If a combination arose when Parke, Davis threatened its wholesalers with termination unless they put pressure on their retail customers, then there can be no doubt that a combination arose between respondent, Milne, and Kroner to force petitioner to conform to the advertised retail price." 390 U.S. at 149, 88 S.Ct. at 871.

Thus, the controlling decisions have distinguished between situations on the one hand, in which the manufacturer simply announced a suggested resale price and refused to sell to dealers who would not adhere to it,[43] and on the other, those in which the manufacturer took further steps to effectuate compliance. If, above and beyond a mere unilateral announcement and refusal to deal steps are taken in order to secure compliance with price maintenance policies, the arrangement constitutes a combination to maintain prices, and is a per se violation of the Sherman Act. Albrecht v. Herald Co., supra; Simpson v. Union Oil Co., supra; United States v. Parke, Davis & Co., supra.

Applying this test to the facts of the instant case, it becomes clear that The News' reliance on *Colgate* is totally misplaced. The record clearly demonstrates that The News terminated sales to most of the plaintiffs only after they refused to participate in its resale price maintenance scheme. When this failed, it enlisted the aid of its franchise dealers and third parties to "detect the route dealers' 'unauthorized sources' . . . ." of supply, which, according to O'Sullivan and Catanzaro, would be terminated. As a result, the route dealers were under constant surveillance by franchise dealers, employees of The News, and off-duty policemen recruited for this purpose. The News even went so far as to have two-way radios installed in four of its cars so that it could coordinate its surveillance activities. When sources of supply were located, The News terminated (or threatened to terminate) all sales to that source or reduced the number of copies it received so that it could no longer supply the cut off route dealers.

The News also instructed its franchise dealers to tell potential home delivery subscribers that the route dealers were no longer in business and that they could obtain home delivery of The News only through authorized franchise dealers.[44] Cf., Albrecht v. Herald Co., supra, 390 U.S. at 150 n. 6, 88 S.Ct. 869.

These anticompetitive practices cannot be considered as isolated incidents, unrelated to The News' illegal price maintenance system. Rather, the record indicates that this concerted activity was designed and executed so as to prevent plaintiffs from dealing in The News and to allow it to control the home delivered price of its paper.

Accordingly, I find that The News' refusal to deal with the plaintiffs is part of an aggregation of trade restraints and predatory practices designed to fix prices in violation of § 1 of the Sherman Act. Cf. United States v. General Motors, supra; Interphoto Corp. v. Minolta

---

43. Despite limitations of the *Colgate* doctrine in recent years, it is still true that a mere refusal to deal, without more, is not a Sherman Act violation. GAF Corporation v. Circle Floor Co., 329 F.Supp. 823, 828 (S.D.N.Y.1971), aff'd, 437 F.2d 752 (2d Cir. 1972), cert. dismissed, 413 U.S. 901, 93 S.Ct. 3058, 36 L.Ed.2d 1045 (U.S. Jan. 12, 1973) (No. 72–984). See also, House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2d Cir. 1962); Carbon Steel Products Corp. v. Alan Wood Steel Company, 289 F.Supp. 584 (S.D.N.Y.1968).

"The Supreme Court has left a narrow channel through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise." Warner & Co. v. Black & Decker Mfg. Co., 277 F.2d 787, 790 (2d Cir. 1960).

44. Plaintiffs claim that The News used lists of customers previously supplied by them to solicit their customers. However, a careful review of the 2,000 page record in this case reveals no evidence which substantiates this claim.

Corp., 295 F.Supp. 711, 723 (S.D.N.Y.), aff'd, 417 F.2d 621 (2d Cir. 1969). It follows that the route dealers who were cut off by The News on or after January 10, 1966 have established all of the necessary elements of a § 1 Sherman Act violation. The same is true for plaintiff Rathsam against whom The News and its franchise dealers conspired to prevent from obtaining papers.

Plaintiffs also contend that the territorial [45] and customer [46] restrictions in the franchise agreement violate Section 1 of the Sherman Act. These contentions do not require extended discussion.

In United States v. Arnold, Schwinn, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Supreme Court considered such restrictions and found them to be per se violations of the Sherman Act.

The Schwinn distribution network consisted of 22 wholesale distributors who were permitted to resell Schwinn products only to franchise dealers in assigned territories. Schwinn would ship its bicycles to the distributors on a sale or consignment basis, or alternatively would ship directly to the franchise dealer pursuant to an order placed through the distributor. The recipients of the bicycles could transfer them only to ultimate consumers or franchised dealers. Schwinn did not, however, control the resale prices of either the wholesalers or the retailers, except in the case of a few fair traded models.

The Court held that even in the absence of price fixing, it is "unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it." 388 U.S. at 379, 87 S. Ct. at 1865. The Court ordered entry of a decree enjoining Schwinn from imposing any limitations on the distributors' and retailers' rights to dispose of purchased Schwinn products "where and to whomever they choose."

The News' franchise agreement, therefore, falls squarely within the proscription of *Schwinn* because it parts with title, dominion and risk of loss when it sells its newspapers to its franchise dealers.[47]

■ Moreover, these restrictions are unlawful even under pre *Schwinn* authority. It has long been established that vertical restraints as to territory or customers are per se violations of the Sherman Act if they are ancillary to

---

45. Section III of The News' Independent Home Delivery Carrier Agreement provides, inter alia, that:

"The territory to which this agreement shall apply and in which the sales of copies of the Daily and Sunday News to home delivery subscribers shall be made by the carrier is known and designated as Home Delivery Area Number___ . . . ."

The News strenuously urges that the franchise agreement does not limit the area in which the franchise dealers are permitted to sell The News. I find this reading of the agreement is contrary to its plain language and spirit. Cf. Lepore v. New York News, Inc., 346 F.Supp. 755, 761 (S.D.N.Y.1972).

The News granted each franchise dealer an exclusive territory in order to insure that he would devote his time and effort to developing sales in that territory. In this way, each dealer would concentrate on taking business away from The News' competitors rather than from his fellow franchise dealers. See Note, Restricted Channels of Distribution Under the Sherman Act, 75 Harv.

L.Rev. 795 (1962); Cf. Stewart, Exclusive Franchises and Territorial Confinement of Distributors, 22 A.B.A. Antitrust Section 33, 37 (1963).

46. Section II of the Agreement provides that the franchise dealer:

" . . . agrees . . . to purchase from The News, on each day of publication, a sufficient number of copies of the Daily and Sunday News to supply all single copy home delivery subscribers within his territory . . . [and] to supervise and direct the resale of the Daily and Sunday News to such regular subscribers in his territory . . . ."

The News concedes that this clause of the agreement prohibits the franchise dealers from reselling newspapers purchased from it to anyone other than their delivery boys.

47. Section III(e) of the franchise agreement specifically provides that "The carrier will not . . . have the right to return . . . unsold copies of the Daily or Sunday News."

price fixing as they clearly are here. See White Motor Co. v. United States, 372 U.S. 253, 260, 83 S.Ct. 696, 9 L.Ed. 2d 738 (1963); United States v. Bausch & Lomb Op. Co., 321 U.S. 707, 720, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). See also, United States v. Arnold, Schwinn & Co., 388 U.S. 365, 373, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); United States v. Sealy, Inc., 388 U.S. 350, 357, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967).

## VI.

Plaintiffs further claim that defendants "attempted to monopolize and combined and conspired to monopolize, a part of the newspaper trade", by driving them out of business. They do not, however, argue that defendants actually monopolized [48] any market or submarket.

The Supreme Court has succinctly defined "attempt to monopolize" as the "employment of methods, means and practices which would, if successful, accomplish monopolization, and which though falling short nevertheless approach so close as to create a dangerous probability of it." American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946). See also, Lorain Journal v. United States, 342 U.S. 143, 153, 72 S. Ct. 181, 96 L.Ed. 162 (1951); Swift & Co. v. United States, 196 U.S. 375, 396, 402, 25 S.Ct. 276, 49 L.Ed. 518 (1905). The necessary elements of an attempt to monopolize are (1) a specific intent to effect a consequence definable as monopolizing [49] and (2) conduct imminently threatening accomplishment of that consequence.[50] See Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Lorain Journal v. United States, supra, 342 U.S., at 153, 72 S.Ct. 181; Swift & Co. v. United States, supra, 196 U.S., at 396, 25 S.Ct. 276; United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2d Cir. 1961). See also, Note, 27 Geo.Wash.L.Rev. 227, 244 (1958). This definition is consistent with the general criminal rule that an attempt is not made out unless the conduct, if successful, would constitute the crime.[51] See Holmes, The Common Law 65–70 (1881); Hall, Criminal Attempt—A

48. Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it illegal for any person to "monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."

Thus, Section 2 establishes three separate offenses: (a) monopoly, (b) attempting to monopolize, and (c) combining or conspiring with any other persons to monopolize any part of the trade or commerce among the several states, or with foreign nations.

The basic element of the offense of monopolization is possession of monopoly power— that is, ability to control prices in and exclude competitors from the relevant market. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 391, 393, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Standard Oil Co. of N. J. v. United States, 221 U.S. 1, 51, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

49. Specific intent requires proof that the defendant intended the particular acts in question, as well as proof that he intended thereby to acquire monopoly power. See Times-Picayune Pub. Co. v. United States, supra, 345 U.S., at 626, 73 S.Ct. 872, United States v. Aluminum Co. of America, 148 F. 2d 416, 432 (2d Cir. 1945). Cf. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); United States v. Illinois Cent. R. Co., 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938).

50. This element is sometimes equated with dominant market power. See Lorain Journal v. United States, supra, 342 U.S., at 154, 72 S.Ct. 181; Cornwell Quality Tools Co. v. C. T. S. Company, 446 F.2d 825, 830 (9th Cir.), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1971).

51. This situation is characterized as legal (as opposed to factual) impossibility. Thus, where the taking of a particular object would not be larceny, the attempt to do so cannot be attempted larceny. People v. Jaffe, 185 N.Y. 497, 78 N.E. 169 (1906). See also, Morissette v. United States, 342 U.S. 246, 261 n. 19, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Factual impossiblity, on the other hand, does not preclude a conviction for attempt. See Note, 42 N.Y.U.L.Rev. 110, 114 (1967).

**674**

Study of Criminal Liability, 49 Yale L.J. 789 (1940); Arnold, Criminal Attempts —The Rise and Fall of an Abstraction, 40 Yale L.J. 53 (1930). See also, Diamond International Corp. v. Walterhoefer, 289 F.Supp. 550, 577 (D.Md.1968). Obviously, proof of a relevant market is essential to a claim of attempted monopolization in that one cannot determine whether the defendant's conduct, if successful, would amount to monopolization without definition of the market sought to be dominated.[52] Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Diamond International Corp. v. Walterhoefer, 289 F. Supp. 550, 577 (D.Md.1968); United States v. Chas. Pfizer & Co., 245 F. Supp. 737, 739 (E.D.N.Y.1965). But see Lessig v. Tidewater Oil Co., 327 F.2d 459, 474 (9th Cir.), cert. denied, 377 U. S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

The relevant market is the "area of effective competition" in which the defendant operates. Standard Oil of Cal. v. United States, 337 U.S. 293, 299 n.5, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). It consists of both a product market and a geographic market. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). To delineate the relevant market attention must be focused on the products which compete with The News in the home delivery market; that is, the spectrum of products in which there is such a cross elasticity of demand that consumers will turn to them if The News' home delivery price or other conditions of sale render it undesirable. See United States v.

Du Pont De Nemours & Co., 351 U.S. 377, 395–400, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Likewise, the market must be carved out geographically, by determining the area in which The News' home delivery program faces meaningful competition. See Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 279, 55 S.Ct. 182, 79 L.Ed. 356 (1934).

In this case, it is clear that the relevant geographic market is the New York City Metropolitan area.[53] The identification of the relevant product market, however, is more complex.

The leading case outlining the criteria for determining the relevant product market is United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S. Ct. 994, 100 L.Ed. 1264 (1956). In that case, the government charged Du Pont with monopolizing interstate commerce in cellophane. Du Pont acknowledged that it was the leading cellophane manufacturer, but argued that there was intense price and quality competition between cellophane and other wrapping materials and that it therefore lacked monopoly power over the market in which cellophane was sold. The case turned on whether the relevant market was cellophane (of which Du Pont had a predominant 75% share) or all "flexible packaging material" (of which Du Pont's share was less than 20%).[54]

The Court held that the relevant market was "composed of products that have reasonable interchangeability for the purposes for which they are produced— price, use and qualities considered." 351 U.S. at 404, 76 S.Ct. at 1012.[55] It

---

52. Since monopolizing requires monopoly power, there is no serious threat of monopolization unless the actor holds monopoly power or there is a dangerous probability he can acquire monopoly power. Note, 27 Geo. Wash.L.Rev. 227, 244 (1958). Cf. United States v. Consolidated Laundries Corporation, 291 F.2d 563, 573 (2d Cir. 1961)

53. For purposes of this discussion, the New York City Metropolitan Area is defined as New York City and the surrounding areas of

New York, Connecticut, and New Jersey within a radius of fifty miles from the City.

54. The Court noted that "If cellophane is the 'market' that Du Pont is found to dominate, it may be assumed it does have monopoly power over that 'market'." 351 U.S. at 391, 76 S.Ct. at 1005.

55. Earlier in the opinion the Court expressed a similar view:

"[W]here there are market alternatives that buyers may readily use for their pur-

therefore focused on whether there were substitutes for cellophane and held that the identity of the relevant market depended on whether there was a cross-elasticity of demand between cellophane and other wrappings.

"If a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would indicate that a high cross-elasticity of demand exists between them; that the products compete in the same market." 351 U.S. at 400, 76 S.Ct. at 1010.

Applying this test, the Court concluded that the competition between cellophane and other flexible packaging materials was sufficient to prevent cellophane from constituting a separate relevant market and that the relevant market for determining the extent of Du Pont's market control was the market for flexible packaging materials. On this basis, the Court upheld the lower court's conclusion that Du Pont lacked monopoly power.

In determining the relevant product market in this case, therefore, it is necessary to determine the products which compete with The News in the home delivery market. Plaintiffs argue that there are none, and that The News is so unique that it occupies a product market of its own. The News, on the other hand, contends that it competes with some 37 newspapers, as well as television and other media. Though I reject The News' attempt to define the product market in terms which include other media,[56] I accept its contention that it competes with numerous other newpapers because plaintiffs have failed to adduce any evidence in the record to justify any other product market selection.[57] See Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 612, 73 S. Ct. 872, 97 L.Ed. 1277 (1953); United

---

poses, illegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be a part of the market." 351 U.S. at 394, 76 S.Ct. at 1006.

56. It is now well settled that the daily newspaper is a distinct line of commerce. See e. g., United States v. Citizen Publishing Company, 280 F.Supp. 978, 985–987 (D.Ariz. 1968), aff'd, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); United States v. Times Mirror Company, 274 F.Supp. 606, 617 (C. D.Cal.1967), aff'd mem., 390 U.S. 712, 88 S. Ct. 1411, 20 L.Ed.2d 252 (1968).

It is true that in some of the services which they provide, daily newspapers compete with radio and television stations, weekly newspapers and magazines and a wide variety of specialized publications. See generally, Markham, Economic Analysis of Competition in the Daily Newspaper Business, in American Newspaper Publishers Ass'n. Newspapers (1963). Cf. Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). This does not mean however, that all competitors of any service provided by a daily newspaper can be lumped into the same line of commerce. United States v. Times Mirror Company, supra, 274 F.Supp., at 618. Cf. United States v. Continental Can Co., 378 U.S. 441, 449, 84 S.Ct. 1738, 12 L.Ed.2d 953

(1964); Plastic Packaging Materials, Inc. v. Dow Chemical Co., 327 F.Supp. 213, 229 (E.D.Pa.1971).

In this regard, Judge Ferguson's remarks in the *Times Mirror Company* case are particularly relevant:

"The daily newspaper business is a distinct line of commerce and is a product separate and distinct from any other product. It has sufficient peculiar characteristics and uses which make it distinguishable from all other products. . . .

The daily newspaper provides a cluster of services in one unique package. It provides readers with a daily written record of current events and reference information including vital statistics, public announcements, legal notices, box scores, stock market reports, weather reports, theater listings and radio and television logs. They provide more wider and deeper coverage of all news —international, national and local—than any other medium of daily news dissemination." 274 F.Supp. at 617.

57. Plaintiffs introduced no evidence to negate The News' claim of high cross elasticity of demand between The News and other home delivered papers. Indeed, the record indicates that it was able to compete effectively with other home delivered papers only after its price relative to the other papers was lowered.

States v. Chas. Pfizer & Co., 246 F. Supp. 464, 470 (E.D.N.Y.1965). Plaintiffs have simply not shown that a person contemplating home delivery of The News would not consider as an alternative, home delivery of the New York Times, Newsday, the Long Island Press or any one of a number of other newspapers. This was clearly their burden and failure to do so is fatal to this aspect of their case. United States v. Chas. Pfizer & Co., 246 F.Supp. 464 (E.D.N.Y. 1965). Cf. Times-Picayune Publishing Co. v. United States, supra, 345 U.S., at 626, 73 S.Ct. 872.

In any event, plaintiffs have failed to prove that The News had the requisite specific intent to monopolize. Notwithstanding the predatory nature of many of its acts, I am convinced that its primary concern was not the elimination of its competitors.

■ Plaintiffs' claim that The News and its franchise dealers "combined and conspired to monopolize a part of the newspaper trade" requires a separate analysis because the elements of attempted monopolization and conspiracy to monopolize differ. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 709, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); United States v. Consolidated Laundries Corp., 291 F.2d 563, 573, (2d Cir. 1961); United States v. Chas. Pfizer & Co., 245 F. Supp. 737, 738 (E.D.N.Y.1965). See also, Note 27 Geo.Wash.L.Rev. 227, 241 (1958). While attempted monopolization requires conduct imminently threatening monopolization, all that is needed to establish a conspiracy to monopolize is the act of conspiring. See Nash v. United States, 229 U.S. 373, 378, 33 S. Ct. 780, 57 L.Ed. 1232 (1913). Cf.

Hyde and Schneider v. United States, 225 U.S. 347, 387–388, 32 S.Ct. 793, 56 L.Ed. 1114 (1912) (dissenting opinion). Thus, Section 2 prohibits any combination or conspiracy to monopolize whether it be "wholly nascent or abortive on the one hand, or successful on the other." See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225–226 n. 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129 (1940). See also, American Tobacco Co. v. United States, 328 U.S. 781, 809–811, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

■ For this reason, there is no necessity to consider market power in § 2 conspiracy cases. See United States v. Yellow Cab Co., 332 U.S. 218, 225–226, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); United States v. Consolidated Laundries Corporation, supra, 291 F.2d at 573. Cf. United States v. Du Pont De Nemours & Co., 351 U.S. 377, 395 n. 23, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The only inquiry is whether there has been a combination or conspiracy "to monopolize any part of the trade or commerce among the several States." See American Tobacco Co. v. United States, supra, 328 U.S., at 789, 66 S.Ct., at 1129.

■ Since Section 2 makes it unlawful to conspire to monopolize "any part" of commerce,[58] a violation is made out if any appreciable part of interstate commerce [59] is the subject of the conspiracy. United States v. Yellow Cab Co., supra, 332 U.S., at 225–226, 67 S.Ct. 1560; United States v. Consolidated Laundries Corporation, supra, 291 F.2d, at 573; Turner, Antitrust Policy and the Cellophane Case, 70 Harv.L.Rev. 281, 294, 304–305 (1956). The home delivery market for The News obviously qualifies. Cf. Mt. Lebanon Motors, Inc. v. Chrysler Corporation, 283 F.Supp. 453,

58. The phrase "any part" of commerce has "both a geographical and a distributive significance. . . . [i]t includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce." Standard Oil Co. v. United States, 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). Thus trade in a particular geographical area or in a

particular article of commerce is sufficiently identifiable as a "part" of commerce capable of being restrained or monopolized. See Mt. Lebanon Motors, Inc. v. Chrysler Corporation, 283 F.Supp. 453, 460 (W.D.Pa.1968), aff'd, 417 F.2d 622 (3rd Cir. 1965).

59. The News does not contest the fact that it is engaged in interstate commerce within the meaning of the Sherman Act.

460 (W.D.Pa.1968), aff'd, 417 F.2d 622 (3rd Cir. 1969). In April, 1973 some 352,000 copies of The News were home delivered daily and some 451,000 copies were home delivered on Sundays.[60] These deliveries constituted almost 20% of The News' total net sales.[61]

■ Since plaintiffs have conclusively demonstrated that The News and its franchise dealers conspired to eliminate infrabrand competition in the home delivery market,[62] they have established a conspiracy to monopolize "a part" of interstate commerce.

## VII.

Plaintiffs allege that the exclusive dealing arrangement between The News and its franchise dealers violates § 3 of the Clayton Act, 15 U.S.C. § 14.[63] The defendants, on the other hand, deny this allegation and contend that the plaintiffs have no standing to challenge this provision.

■ The test in this Circuit for determining standing to sue in antitrust actions is whether plaintiff is able to allege and prove damage to himself resulting from the defendant's illegal act. See e. g., Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L. Ed.2d 826 (1971), reh. denied, 401 U.S. 1014, 91 S.Ct. 1250, 28 L.Ed.2d 553; SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956).

This requirement is entirely consistent with the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble damage action. Where there exists a plaintiff directly injured who can sue, if he desires, the public policy can be vindicated by him and it is neither necessary nor proper to extend the right to sue to those who have not actually sustained injury.

■ In evaluating plaintiffs' § 3 claim, the threshold question is not whether defendants violated § 3, but whether plaintiffs have been injured "by reason of" the alleged violation. GAF Corporation v. Circle Floor Co., Inc., 463 F.2d 752, 758 (2d Cir. 1972), cert. dismissed 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045; Billy Baxter, Inc. v. Coca-Cola Co., supra; Carswell Trucks, Inc. v. International Harvester Co., 334 F.Supp. 1238, 1239 (S.D.N.Y.1971).

■ Though plaintiffs state that the merits of their § 3 claim is "too obvious to document", I find it difficult to see how any economic loss suffered by them can be attributed to the exclusive dealing clause. If the franchise dealers were authorized to handle other newspapers, the route dealers would face additional competition. However, the franchise agreement forecloses this possibility and leaves The News' competitors little choice as a practical matter but to employ plaintiffs to distribute their papers. The net effect of the clause is to limit plaintiffs' competition in the home delivery market. Therefore, whatever impact the exclusive dealing provision has upon the franchise dealers, competing newspapers or potential competitors

---

60. See defendants' Exhibit R and supplement thereto.

61. Id.

62. See Sections II (statement of facts) and IV (termination of plaintiffs was pursuant to an illegal agreement to restrain trade) of this opinion.

63. Section 3 of the Clayton Act provides in pertinent part that:
"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods . . . or resale within the United States . . . on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, . . . of a competitor or competitors of the less[ee] or seller, where the effect of such lease, sale or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

of The News, it can only benefit plaintiffs. Accordingly, I find as a matter of law that the provision does not injure plaintiffs in their business or property and that they have no standing to contest its validity.

However, even if they had standing to sue they would be unable to make out a violation of § 3 on this record.

■ Exclusive dealing contracts are not illegal per se., Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 333, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). The Court must examine the relevant facts and circumstances surrounding the challenged conduct to determine whether they have a prohibited effect i. e., to substantially lessen competition or a tendency to create a monopoly. See Chicago Bd. of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

■ This normally requires consideration of (1) the product market or line of commerce and the geographic market or area of effective competition, and (2) the impact of the arrangement on competition. Tampa Electric Co. v. Nashville Coal Co., supra, 365 U.S. at 327, 81 S.Ct. 623; United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); Standard Oil of California v. United States, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

In *Tampa*, supra, the Court held that for purposes of analyzing an exclusive dealing agreement under § 3, the relevant market is not the supplier's own market, but the broader area in which his competitors operate. This plaintiffs have completely failed to identify, a shortcoming which would in itself require dismissal. See United States v. E. I. Du Pont De Nemours Co., supra, 353 U.S. at 593, 77 S.Ct. 872; United States v. Chas. Pfizer & Co., 246 F.Supp. 464 (E.D.N.Y.1965). However, since it is clear that the relevant market here encompasses at least the newspaper home delivery market in the New York City Metropolitan area,[64] Mytinger & Casselberry, Inc. v. F. T. C., 112 U.S.App.D.C. 210, 301 F.2d 534 (1962); Cf. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), I have decided to overlook this defect.

■ Once the area of effective competition has been defined, an analysis must be made to determine if the effect of the arrangement "may be to substantially lessen competition or to create a monopoly" in this market. Brown Shoe Co. v. United States, 370 U.S. 294, 328, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); Tampa Electric Co. v. Nashville Coal Co., supra, 365 U.S. at 328, 81 S.Ct. 623 (1961). The crucial inquiry is whether the opportunity for other competitors to enter or remain in the market has been significantly limited, Tampa Electric Co. v. Nashville Coal Co., supra, 221 U.S. at 328, 81 S.Ct. 623; Standard Oil Co. of California v. United States, supra; see also, Att'y Gen. Nat'l Comm. Antitrust Rep. 146 (1955), taking into account: "[t]he relative strength of the parties, the proportionate volume of commerce in the relevant market area, and the probable immediate and future effects which preemption of that share of the market might have on effective competition." Tampa Electric Co. v. Nashville Coal

---

64. For purposes of analyzing plaintiffs' § 3 claim, I have defined the relevant market to be the newspaper home delivery market in the New York Metropolitan area. This, however, is an extremely restrictive definition, see Mytinger & Casselberry, Inc. v. F. T. C., supra, 301 F.2d at 542 (dissenting opinion), and there is substantial evidence in the record which would support a finding that the relevant market is not nearly so circumscribed. Indeed, it may well be that other newspaper outlets effectively compete with home delivery dealers for the daily newspaper trade and that the mode of retailing is not a meaningful basis for distinguishing newspaper outlets for purposes of § 3. See Tampa Electric v. Nashville Coal Co., supra, 365 U.S. at 330–333, 81 S.Ct. 623; Cornwell Quality Tools Co. v. C. T. S. Company, 446 F.2d 825, 830 (9th Cir.), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L. Ed.2d 740 (1971).

Co., supra, 365 U.S. at 329, 81 S.Ct. at 629.

Plaintiffs adduced little to indicate the probable anti-competitive effects of the exclusive dealing arrangement. This, assuming standing, is clearly their burden, and unless it is met, the court cannot give appropriate scrutiny to the economic ramifications, including possible justification. Susser v. Carvel Corp., 332 F.2d 505, 516 (2d Cir. 1964), cert. granted, 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), cert. dismissed as improvidently granted, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).[65] Here, there has been no showing that interbrand competition has been significantly limited or that entrance into the newspaper publishing market has been foreclosed. Instead, the record indicates that existing newspapers have remained in the market and successfully competed with The News.

Plaintiffs rely exclusively on Standard Oil Co. of Calif. v. United States, supra. There, the Supreme Court held illegal *Standard's* exclusive dealing contracts with sixteen percent of the independent dealers in a seven-state area involving 6.7 percent of the total gallonage sold in the area. In concluding that the contracts foreclosed competition in a substantial share of the relevant market, the Court applied what has become known as the "quantitative substantiality" test and refused to consider whether the contracts had in fact harmed competition or whether they were justified on economic grounds. The Court held that

"the qualifying clause of § 3 is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected" and that it is not necessary to demonstrate "that competitive activity has actually diminished or probably will diminish." 337 U.S. at 314, 69 S.Ct. at 1062.

■ However, in Tampa Electric Co. v. Nashville Coal Co., supra, the Court departed from the rigorous and inflexible rule it had established in *Standard Oil* and erected criteria which demand close scrutiny of the economic ramifications of an exclusive dealing arrangement in order to determine its probable anti-competitive effects.[66] See Susser v. Carvel Corporation, supra, 332 F.2d at 516; United States v. Chas. Pfizer & Co., supra, 246 F.Supp. at 471; Curly's Dairy, Inc. v. Dairy Cooperative Association, 202 F.Supp. 481, 484–485 (D. Or.1962); Bok, The Tampa Electric Case and the Problem of Exclusive Arrangements Under the Clayton Act, 1961 Sup.Ct.Rev. 281–285. Neither comparative quantitative substantiality (i. e., the market share foreclosed) nor absolute quantitative substantiality (i. e., the dollar volume foreclosed) is controlling. Curly's Dairy, Inc. v. Dairy Cooperative Association, supra. Instead, the test is whether the system of challenged exclusive arrangements in fact forecloses competitors from a substantial market. Att'y Gen. Nat'l Comm. Antitrust Rep. 146 (1955).

Any new newspaper can readily enter the market through the independent

---

65. In *Susser*, the plaintiffs failed to introduce evidence of the anti-competitive effects of the exclusive dealing arrangement in question. Chief Judge' Lumbard commented that "[i]nstead of introducing evidence to establish the economic effects of the Carvel franchise structure, [plaintiffs] merely protest that anti-competitive effects may be inferred solely from the existence of such a network of exclusive dealerships. But the whole tenor of Tampa Electric does not permit adherence to such a [strict] standard of legality." 332 F.2d at 516.

66. See discussion at pages 678, 679, supra. The Court stated that:

"* * * To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence."

route dealers who do not have exclusive dealing arrangements or via a carrier boy system as did Newsday, The Long Island Press and The Suffolk Sun. The News' competitors have ready access to a sufficient number of outlets to permit the effective marketing of their products.

It follows, therefore, that The News' exclusive dealing arrangements do not foreclose The News' competitors from a substantial portion of the market and that plaintiffs' Section 3 claim must be dismissed.

## VIII.

Plaintiffs finally contend that The News discriminated "between different purchasers of commodities of like grade and quality" in violation of §§ 2(a), 2(c), 2(d) and 2(e) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. §§ 13(a), 13(c), 13(d) and 13(e), and that the franchise dealers violated § 2(f) of the Act, 15 U.S.C. § 13(f), by receiving and accepting preferential treatment from The News.

Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, is directed at preventing certain types of discrimination by sellers in interstate commerce.[67] See generally, Rowe, Price Discrimination Under the Robinson-Patman Act. However, its jurisdictional requirements are far narrower than the "effect on commerce" test of the Sherman Act.[68] See Lehrman v. Gulf Oil Corp., 464 F.2d 26, 37 (5th Cir. 1972), cert. denied, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1973); Cliff Food Stores, Inc. v. Kroger, 417 F.2d 203, 208 (5th Cir. 1969); Willard Dairy Corp. v. National Dairy Prods. Corp., 309 F.2d 943, 946 (6th Cir. 1962), cert. denied, 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963); Central Ice Cream Co. v. Golden Rod Ice Cream Co., 287 F.2d 265, 267 (7th Cir. 1961). It specifically requires that the discriminator be "engaged in commerce", that the discrimination be "in the course of such commerce", and that "either or any of the purchases involved in such discrimination are in commerce . . ."[69] See

---

67. Section 2(a) prohibits discriminatory pricing under certain circumstances by "any person engaged in commerce, in the course of such commerce . . . where either or any of the purchases involved in such discrimination are in commerce . . ." Section 2(f) is a corollary to § 2(a) and makes it unlawful "knowingly to induce or receive" such a price discrimination.

Sections 2(c), 2(d) and 2(e) make unlawful various business practices other than price discrimination. Section 2(c) outlaws the payment or receipt of commissions or brokerage allowances "except for services rendered." Section 2(d) makes it unlawful for a supplier to grant advertising or other sales promotional allowances to one "customer" who resells the supplier's "products or commodities" unless the allowances are "available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." Section 2(e) makes it unlawful for a supplier to furnish services to one purchaser which are "not accorded to all purchasers on proportionally equal terms."

68. In Hiram Walker, Inc. v. A & S Tropical, Inc., 407 F.2d 4 (5th Cir.), cert. denied, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969), the Court noted that:

"In an action brought under the Robinson-Patman Act it is necessary to allege and prove that the transactions complained of are actually in interstate commerce, while in actions brought under the Sherman Anti-Trust Act it is sufficient if the transactions complained of are shown to have affected interstate commerce." 407 F.2d at 8.

69. The quoted language is from § 2(a), 15 U.S.C. § 13(a) which provides in relevant part:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, *where either or any of the purchases involved in such discrimination are in commerce,* where such commodities are sold for use, consumption, or resale within the United States . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce . . ." (Emphasis added).

It qualifies each of the pertinent sections except § 2(e) from which it was inadvertently omitted. See Elizabeth Arden, Inc. v. Federal Trade Commission, 156 F.2d 132 (2d Cir. 1946); Elizabeth Arden Sales Corp.

Rowe, Price Discrimination Under the Robinson-Patman Act 3–23 (1962); Note 86 Harv.L.Rev. 765, 769 (1973).

█ The requirement that "either or any of the purchases involved [be] in commerce" has consistently been interpreted to mean that the Act is applicable only where "at least one of the two transactions . . . cross a state line." [70] Walker Oil Co. v. Hudson Oil Co., 414 F.2d 588, 589–590 (5th Cir. 1969), cert. denied, 396 U.S. 1042, 90 S. Ct. 684, 24 L.Ed.2d 686 (1970). See also, Littlejohn v. Shell Oil Co., 483 F.2d 1140 (1973), cert. denied, —— U.S. ——, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973). Anaya v. Las Cruces Sun News, 455 F.2d 670 (10th Cir. 1972); Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir.), cert. denied, 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972); Hiram Walker. Inc. v. A & S Tropical, Inc., 407 F.2d 4 (5th Cir.), cert. denied, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969); Willard Dairy Corp. v. National Dairy Products Corp., 309 F.2d 943 (6th Cir. 1962), cert. denied, 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963).

█ To prevail on their Robinson-Patman claims, plaintiffs must demonstrate, inter alia,: (1) that The News is engaged in commerce; (2) that, in the course of such commerce, it has discriminated between different purchasers of The News; and (3) that the discriminatory transactions took place "in commerce" (i. e., crossed state lines). This is an insurmountable burden on the proof in this case. Plaintiffs Hand, Shank, Fox, Greenberg and Holman are the only plaintiffs who compete with franchise dealers and purchase from The News. Therefore, they are the only "purchasers" who have been denied equal treatment. See Callman, Unfair Competition, Trademarks and Monopo-

lies § 28.1(a) (3rd Ed. 1971). Since all of their routes are in New York where The News is published, sold at wholesale to their competitors and resold to home delivery subscribers, they have failed to prove that any discriminatory transactions took place "in commerce". Accordingly, plaintiffs' Robinson-Patman claims are dismissed.

The above shall constitute my findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

The parties are directed to prepare a judgment incorporating these findings of fact and conclusions of law and specifying an appropriate form of injunctive relief.

So ordered.

### JUDGMENT

This action came on for trial before the Court, and the issues having been duly tried, and a decision having been duly rendered in an opinion dated June 29, 1973, and the Court having ordered that the said opinion shall constitute its Findings of Fact and Conclusions of Law, and having directed the parties to propose an appropriate form of injunctive relief, and this Court having jurisdiction of this cause based upon Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26,

It is ordered and adjudged:

That plaintiffs Freilich, Rosenblatt, Theall, Salant, Cestaro, Ellis, Marston and Silverstein have failed to make out a claim for relief under any of the antitrust laws and their claims are hereby dismissed;

That plaintiffs Bowen, Cartabuke, Ditta and Failla, Davis, Goldberg, Gullo,

---

v. Gus Blass Co., 150 F.2d 988 (8th Cir. 1945); Callman, Unfair Competition Trademarks and Monopolies, § 28.1(e) (1971).

70. In Cliff Food Stores, Inc. v. Kroger, Inc., supra, the Court held that ". . . the

critical language in the statute has been repeatedly construed to mean that the seller must not only be engaged in interstate commerce, but one of the discriminatory sales must also be in interstate commerce." 417 F.2d at 209.

Markowitz, Mirro, Poserow, Rosenblum, Schulz, Sweeney, Kahrs, Floral Park News Delivery, Inc. (Gold), Amato, Perrot, Huntington News Delivery, Inc. (Hand), Shank, Fox, Greenberg, Holman and Rathsam are entitled to recover treble damages under Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 and 2, in an amount to be determined by the Court at a continued trial on the damage question;

That said continued trial and the operation of this judgment be stayed pending determination of the appeal of this judgment by defendants, so long as defendants are diligently pursuing said appeal in accordance with the applicable rules; and it is further

Ordered and adjudged that defendants and each of them and their officers, agents and employees, and those persons in active concert or participation with them who receive actual notice of this judgment by personal service or otherwise, be and the same hereby are permanently enjoined and restrained from the following:

1. Combining, conspiring or agreeing to monopolize trade in the newspaper home delivery market, and in particular from entering into any combination, conspiracy or agreement to eliminate intrabrand competition in the home delivery market;

2. Fixing or establishing the prices at which wholesalers, including franchise dealers who resell to carrier boys or others for resale to ultimate consumers, may resell copies of the Daily and Sunday News to carrier boys or others who purchase such papers for resale to ultimate consumers, and in particular, and without limitation, from requiring adherence to or enforcing Sections II(b) and IV(d) of the franchise agreement insofar as those provisions relate to resale prices to carrier boys or other retailers;

3. Fixing or establishing, by agreement with any wholesaler, including a franchise dealer, the prices at which a retailer, including a franchise dealer's carrier boys, resells The News to subscribers, and in particular, but without limitation, requiring adherence to or enforcement of Sections II(b) and IV(d) of the franchise agreement insofar as those provisions relate to resale prices by carrier boys to home delivery subscribers;

4. Compelling or coercing any wholesaler to establish, adopt, adhere to, or enforce adherence to, any suggested retail prices, markups or margins of profit;

5. Refusing to deal with any independent route dealer in connection with any scheme to fix or maintain retail prices or in connection with any conspiracy to monopolize home delivery sales; provided, however, that for a period of three years from the date this judgment becomes final, the New York News, Inc. shall sell directly to any independent route dealer who has at any time been a plaintiff in this lawsuit at the then current newsstand dealer prices, upon written notice to The News, his requirements of the Daily and Sunday News;

6. Restricting in any manner the resale of defendant News' newspapers with regard to territory or customers, and in particular from requiring franchise dealers to limit their sales to the territory described in Section III of the franchise agreement and from requiring the franchise dealer to limit his sales to single copy home delivery subscribers;

7. Terminating or suspending any independent route dealer, who is or has been a plaintiff herein, as a dealer in The News without just cause; provided, however, that the burden of showing that The News has acted without just

cause shall be on the terminated or suspended plaintiff route dealer;

- 8. Intimidating, coercing or harassing any independent route dealer or his carriers and/or employees;

9. Following, trailing, putting under surveillance, or harassing any route dealer for the purpose of preventing him from lawfully obtaining copies of the Daily and Sunday News from any lawful source;

10. Terminating or threatening to terminate sales to any dealer of the Daily or Sunday News who is, has been, or may be a lawful source of supply of newspapers for any route dealer, or reducing or threatening to reduce the number of copies to be sold to such dealer;

11. Falsely advising any present, potential or past home delivery subscriber that any plaintiff route dealer is no longer in business; that home delivery subscribers can obtain home delivery of The News only through franchise dealers; or that the papers sold by any plaintiff route dealers are stolen.

Subject to the foregoing injunctive provisions, nothing in this judgment shall prevent The News from maintaining and creating or eliminating areas or territories of prime responsibility for its franchise dealers; from recognizing its franchise dealers as its exclusive home delivery distributors; or from choosing and selecting its distributors and retailers or designating geographic areas in which such distributors shall respectively be primarily responsible for distributing the Daily and/or Sunday News.

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this judgment, for the modification of any of the provisions thereof, for the enforcement of compliance therewith, and punishment of violations thereof.